[Civ. No. 38590. Second Dist., Div. Five. Jan. 23, 1973.]

EVELLE J. YOUNGER, as Attorney General, etc.
(formerly as District Attorney), Plaintiff and Appellant, v.
PETER S. SMITH, as Judge, etc., et al., Defendants and Respondents.

[Civ. No. 40879. Second Dist., Div. Five. Jan. 23, 1973.]

TIMES MIRROR COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE et al., Real Parties in Interest.

[Civ. No. 40912. Second Dist., Div. Five. Jan. 23, 1973.]

JOSEPH P. BUSCH, as District Attorney, etc., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE et al., Real Parties in Interest.

(Consolidated Cases.)

## COUNSEL

Joseph P. Busch, District Attorney, Harry Wood, Harry B. Sondheim and Arnold T. Guminski, Deputy District Attorneys, for Plaintiff and Appellant and for Petitioner in No. 40912.

Robert C. Lobdell, Gibson, Dunn & Crutcher, Robert S. Warren and Gary D. Stabile for Petitioner in No. 40879 and as Amici Curiae on behalf of Plaintiff and Appellant.

McCutchen, Black, Verleger & Shea, Howard J. Privett, Roger A. Ferree, Earl Klein, Feinerman, Furman & Klein, J. Laurent Scharff and Pierson, Ball & Dowd, as Amici Curiae on behalf of Petitioners.

John D. Maharg, County Counsel, Robert C. Lynch, Chief Deputy County Counsel, and Harold S. Vites, Deputy County Counsel, for Defendants and Respondents and for Respondent.

A. L. Wirin, Fred Okrand and Laurence R. Sperber as Amici Curiae on behalf of Defendants and Respondents, Petitioner in No. 40879 and Respondent in No. 40912.

Francis Patrick O'Keefe and Joseph Nick Bravaro as Amici Curiae on behalf of Respondent in No. 40879.

Kanarek & Berlin, Irving A. Kanarek and Sheldon Berlin for Real Party in Interest Antelo.

No appearance for other Real Parties in Interest.

## OPINION

**KAUS, P. J.**—These three matters, one appeal and two writ proceedings, arise collaterally from two separate criminal prosecutions. They involve issues concerning the validity, interpretation and enforceability of orders designed to curb potentially prejudicial pretrial publicity in criminal cases.

In *Younger* v. *Smith* we reverse a contempt conviction because the alleged contemner's harmless news release was protected by the First Amendment.

In *Times Mirror* v. *Superior Court* we hold that a purported direct restraint on the press amounted to judicial overkill and order it vacated.

In *Busch,* we find the same protective order,[1] insofar as it is directed against the prosecution, to have been justified by the circumstances existing at the time it was made.[2]

### FACTS

#### *Younger* v. *Smith, et al.*

This is an appeal by the present Attorney General of California—who at all relevant times was the District Attorney of Los Angeles County—from a judgment of the superior court of that county affirming, in review proceedings (Code Civ. Proc., § 1067 et seq.), a contempt conviction by the respondent Smith, then a judge of the respondent Municipal Court of the Alhambra Judicial District.[3] The punishment imposed was a fine of $50.

---

[1]Orders of the kind under consideration are sometimes referred to as "gag orders" or "publicity orders." The first term is pejorative, the latter perhaps too restrictive. We therefore accept the suggestion of one of the amici curiae who have filed briefs in this matter, and refer to such orders as "protective orders." We realize that those who oppose such orders on principle may find this designation too benign. At least, however, it correctly describes their purpose.

[2]The original record in the three consolidated matters is about one foot thick. Without, of course, agreeing on the conclusions which we should reach, all parties seem to feel that what we ought to do is write a detailed textbook which finally and forever resolves all problems relating to the so-called "fair trial versus free speech" or "fair trial versus free press" controversy. We are flattered but not persuaded. Having in mind the position of this court in the judicial hierarchy and the traditional reluctance of any court to decide more than the issues of the case before it demand, our goal is far more modest.

[3]The reason why Judge Smith, rather than the court on which he then sat, was made the first named respondent to the writ of review, was to lend emphasis to certain jurisdictional contentions made by Younger. They have to do with the limited nature of the powers of a magistrate, as distinguished from those of a judge of a municipal court. We find it unnecessary to address ourselves to those issues. For the sake of simplicity we shall refer to Judge Smith and to his then court as "the respondent."

The case is before us on an agreed statement of facts.

On July 14, 1970, the Los Angeles County District Attorney's office filed a criminal complaint in the Alhambra Judicial District, charging one Siegfried Senff with two counts of murder, two counts of assault with intent to commit murder and one count of arson. Senff was arraigned on July 15, when one of the assault counts was amended to charge an additional murder, presumably because the victim had just died. During the proceedings Judge Smith issued a protective order, restricting the dissemination of information by certain persons connected with the prosecution and defense of the case.[4] A copy was handed to the deputy district attorney present.[5]

The relevant portion of the order prohibited all attorneys connected with the case from making "any statement outside of court as to the nature, substance, or effect of any testimony that has been given."

The preliminary examination took place on August 13. On motion of the defendant the public was excluded. (Pen. Code, § 868.) At the end of the examination Senff was held to answer on all counts. The protective order was ordered to remain in force.

Judge Smith then learned that Younger was contemplating a violation of the order and asked to be advised what news Younger intended to release.[6] On August 17, Younger told Judge Smith, by telephone, just how he intended to violate the order. Judge Smith told him that he would have modified his order to permit the news release which Younger was contemplating, but that he no longer had jurisdiction to do so, having held Senff to answer in the superior court.[7] He was therefore unable to approve the proposed release. Younger said that he did not want to petition

---

[4]The docket sheet for July 15 does not inform us whether the deputy district attorney who was in Judge Smith's court at the time concurred in the issuance of the order, opposed it, or remained silent wondering what he should do.

[5]There is no issue on this appeal with respect to Younger having received notice of the order or of its applicability to him.

[6]It is clear that Younger's contemplated violation was only a skirmish in a battle against protective orders. After the assassination of Senator Kennedy in June 1968, the Los Angeles Superior Court had issued a protective order which Younger attacked in this court. (Younger v. Superior Court, 2nd Civ. No. 33638.) What he got for his pains was mostly post cards: one from this court, denying his petition without issuance of an alternative writ, another from the California Supreme Court, denying his petition for a hearing. The United States Supreme Court denied certiorari. (*Younger* v. *Superior Court*, 393 U.S. 1001 [21 L.Ed.2d 465, 89 S.Ct. 489].)

[7]We express no opinion on the correctness of this disclaimer. The superior court did not acquire jurisdiction until August 20, when the information was filed. One would think that somebody had power to modify the order on August 17.

the superior court for a modification, because it was his intention to test the validity of the order. He then made his statement to the news media which we quote in full. The subject was the preliminary examination:

"Fireman Ben Mathews of the San Gabriel Fire Department testified that he and other firemen were summoned to the home occupied by the defendant in the early morning hours of July 8, 1970. Mathews testified concerning his observations and actions at that time.

"Dr. Eugene Carpenter from the Coroner's Office testified relative to cause of death of Gloria Senff, Edna Chapman and Kim Senff.

"Jenny Senff testified relative to her observations on the night in question.

"Dr. Benjamin Crue testified concerning his examination of Jenny.

"Sergeant Spiller of the Los Angeles Sheriff's Arson Detail testified as an expert relative to the cause of the fire.

"Sergeant Rucker of the San Gabriel Police Department testified to certain statements made by the defendant before his arrest.

"Other evidence was introduced from additional witnesses which satisfied the magistrate that the defendant should be held for trial for three counts of murder, one count of attempted murder and one count of arson."

After certain proceedings which we need not detail, Younger was found in contempt on September 24, 1970. During the course of the hearing on September 24, it became abundantly clear that Judge Smith specifically found that the news release had in no way prejudiced what his order had been designed to protect: Senff's right to a fair trial.

All the same, Younger's bland summary of the witnesses' testimony—their names had been released by the court with the consent of counsel for both sides—had violated the literal terms of the order. Although Judge Smith himself called the release a "sterile statement . . . a technical, nonprejudicial, de minimis[8] violation," he found Younger in contempt because: 1. he had sought a confrontation with the court; 2. district attorneys are not supposed to engage in "civil disobedience . . ."; and 3. Younger had engaged in "flamboyant" conduct when he was served with the court's order to show cause in re contempt, held a press con-

---

[8]Lapsing from the Latin mood, the judge also expressed the view that Younger's release "laid an egg."

ference and appeared on a television news program, "at which time he misstated the facts and the law."[9]

The contempt conviction was affirmed by the superior court.[10] As noted the case is before us on an appeal from its judgment.

### Times Mirror v. Superior Court

### Busch v. Superior Court

These two matters arise out of a currently pending criminal prosecution in which Donald Paul Antelo and Oscar Bejarno Hernandez are being charged with the murder of 4-year-old Joyce Huff, allegedly committed on July 2, 1972, in the Hawaiian Gardens housing project in Los Angeles County. Apparently the victim had been playing with other children in front of a neighbor's home when she was shot. No particular purpose would be served by further detailing what evidence or rumors we know of. The bare facts just related are more than adequate to shock anyone and to arouse the hope that the person or persons responsible will be brought to justice. Indeed it is likely that most persons who become aware of the sudden death of a 4-year-old child under such circumstances would refuse to believe in the possibility that nobody may be criminally responsible for it.

Naturally the homicide caused widespread and intensive publicity. In describing it the news media used such terms as "joy killing," "senseless slaying" and "blatant case of murder." Testimony at the preliminary hearing was reported in some detail. Identification of Antelo and Hernandez as possibly responsible for the homicide came from a teen-age girl who purported to have been in an automobile from which the fatal shot may have been fired. There was media speculation, based at least in part on the evidence at the preliminary hearing, that Joyce had been the unintended victim of a killing in revenge for another homicide committed a few days earlier.[11] In dwelling on that theme, some of the press suggested in

---

[9]The record is not too clear just what misstatements of law Judge Smith felt Younger had made. The misstatement of fact appears to have been to the effect that orders directed against pretrial publicity were being made "routinely," when in fact they had been made in relatively few cases.

[10]Although one would have sufficed, three judges heard the petition. This is permissible. (*Athearn* v. *Nicol,* 187 Cal. 86, 91-93 [200 P. 942].)

[11]The news reports suggested inconsistently that the intended victim of Antelo and Hernandez was either one of the persons responsible for the earlier homicide or one of the persons responsible for the arrest of suspects. The earlier homicide, too, had caused a certain amount of publicity, because of evidence that the victim may not have died from his wounds, but as a result of medical malpractice.

one way or another that both homicides were incidents in a continuing battle between gangs in Norwalk and Hawaiian Gardens—"barrio versus barrio."

The preliminary examination of the case against Antelo and Hernandez had not been closed to the public. Indeed, as noted, much of the publicity given to the crime—certainly most of the publicity identifying Antelo and Hernandez as the persons possibly responsible for it—seems to have been engendered by that hearing. The information was filed in the superior court on August 2, on which day Antelo and Hernandez were arraigned and pleaded not guilty.[12] A little later counsel for Antelo asked the district attorney to stipulate to a change of venue because of the "unbelievable" and "fantastic" amount of publicity in this case.[13] The prosecutor declined. The court itself inquired whether there was "any feeling on the part of either defense or the prosecution that what has become known as a 'gag order' should be applied in this case." Counsel for Antelo replied in the affirmative, requesting specifically that the trial court should also "muzzle the press"—surely not the most felicitous way in which to invoke a prior restraint.[14]

---

[12]To be precise, Hernandez so pleaded. Counsel for Antelo refused to permit his client to plead because he claimed that he could not understand the information. The court then entered the plea for Antelo.

[13]"[Counsel for Antelo]: Your Honor, perhaps the District Attorney is willing to stipulate to a motion to change—in other words is the District Attorney instead of it being on the defendants' for the delays, if the District Attorney would stipulate to the obvious in some of these matters, then there wouldn't be the necessity for some of these pre-trial delays.

"For instance, in this case the Court could almost take—and I ask the Court to take judicial notice of the unbelievable publicity in connection with this case. These defendants are already convicted by that publicity by way of the telephone, television, radio and newspapers.

"If the District Attorney would stipulate to a motion to change venue in this case, the judicial counsel and the people concerned with what happens when venue is changed could become engaged in that and really save time. If they are willing to give more than just lip service—because I am sure the Court is aware, for instance, of the fantastic amount of publicity and in this case we could just quote chapter and verse from all of the newspapers in the Metropolitan area and the Los Angeles Area, including Long Beach newspapers, the television coverage, the taking of these defendants in chains to the Municipal Court in Bellflower which was published, not only in the newspapers, but on television.

"I mean to go through the law and motion on this seems ridiculous especially in view of Maine v. Superior Court and recent pronouncements of our Appellate Courts concerning change of venue. So we would invite—there is no jury present, we would invite the District Attorney to agree to a change of venue."

[14]Counsel for Hernandez at first announced that he would be "willing to stipulate to any type of gag order." However, in an apparent effort to buttress any motion for a change of venue he might want to make in the future, he also expressed the view that

The court then asked for written submissions from counsel with respect to the requested order. While there was some discussion whether the district attorney should take a position with respect to the proposed "muzzling" of the press,[15] it never occurred to anyone that it might be a good idea that the press itself should be heard on that issue.[16] The record shows that the prosecution consistently opposed the issuance of any order prohibiting or restricting pretrial publicity.

There was another hearing before the respondent court on August 11. There had been extensive written submissions on the suggested protective order and after some further argument such an order was read into the record. Together with its recitals it is copied in Appendix A. For the purpose of this opinion it will suffice, at this time, to note that it is directed not only against the persons connected with the prosecution and defense of the criminal case, but that in addition it orders "all agencies of the public media"[17] to "refrain from the publication of any matters with respect to the present cause except as occur in open court."[18] About two weeks later the trial court filed certain "findings with respect to order regarding publicity." They are copied in Appendix B.

On August 25, 1972, the petitioner Times Mirror Company filed what amounts to a class action in this court. It is in the form of a petition for a writ of "mandamus, prohibition or other appropriate writ" and prays

a "gag order might be too late." At a later hearing, on August 11, he disassociated himself from the continued request for a protective order voiced by counsel for Antelo, stating that in his opinion "from a practical standpoint . . . anything published about this case henceforth would probably be beneficial to the defendants" and that "it might tend to counterbalance things." Though named as a real party, Hernandez has not appeared in this court.

[15]Throughout this opinion the word "press" is, of course, intended to include all media.

[16]Counsel for Antelo even argued that the district attorney would be derelict in his duties as a prosecutor if he acted as a spokesman for the press and that, moreover, it would be "in bad taste for the District Attorney to purport to defend the freedom of the press and all of that."

Questions of taste aside, the problem of notice and an opportunity to be heard, presents obvious difficulties when a court purports to restrain media who are not parties to a proceeding or represented in any way, directly or vicariously. (See *In re Berry*, 68 Cal.2d 137, 156, fn. 14 [65 Cal.Rptr. 273, 436 P.2d 273].) No issues on that score have been raised in this proceeding.

[17]It is obvious that, in a pinch, the petitioner Times Mirror Company could make much of the uncertainty inhering in the phrase "agencies of public media."

[18]No one contends that the prohibition against the media was intended to cover only matters which were learned directly or indirectly through violations of the order, by other persons subject to it.

that we order the respondent court to vacate that portion of its August 11 order "purporting to apply to [The Times Mirror Company]" or any other representative of the news media. Various forms of complementary and ancillary relief are also requested, including the issuance of a temporary stay of the August 11 order as applied to the press. We granted the stay and issued an alternative writ.

On September 1 petitioner Busch, the present District Attorney of Los Angeles County, filed a separate petition for a writ of mandate or prohibition seeking, in effect, to vacate the August 11 order as to himself and all other persons affected thereby.

Busch's petition also asked for a temporary stay. We denied the stay, but issued an alternative writ. The Busch and Times Mirror petitions were orally argued together with the Younger appeal. We have received many written and oral submissions from various amici curiae. We take this opportunity to thank them.

DISCUSSION

I.

*Younger* v. *Smith*

█ Younger's attack on his contempt conviction proceeds on many fronts, procedural and substantive.[19] However, when all is said and done,

---

[19]It is apparent that Younger's most able counsel is torn between the primary desire of any appellant's lawyer to prevail on any arguable issue, and his more specific desire to vindicate his client's thesis that orders restricting pretrial publicity are a bad idea, period. Thus certain arguments to the effect that in making the order and finding Younger guilty of contempt, Judge Smith violated procedural due process are presented at length, but in a somewhat cryptic passage we are advised that: ". . . Rather than relying upon these violations of appellant's right to a fair hearing comporting to elementary notions of due process of law as an automatic basis for reversal of the judgment in this case, appellant relies upon these violations for the purpose of buttressing his argument that, as a matter of substantive law in the area of free speech, it is incumbent upon any judge or magistrate who issues an order precluding the dissemination of information to include in that order the factual basis upon which that order has been issued. Thus appellant hopes that in reviewing this matter the court will consider these violations of due process of law not as a ground *per se* for issuance of a writ of review, but rather as a basis for supporting the conclusion that the order precluding the dissemination in this case was void from its inception and continued to be void every time it was reissued. In this way appellant hopes to resolve once and for all the substantive issues posed in this case rather than deferring to some future date resolution of these problems on the ground that a new hearing must be granted to appellant before he can be held in contempt. In other words, appellant seeks relief from this court (either on jurisdictional or on freedom of speech grounds) which will ultimately result in the conclusion that the

it appears that Younger was convicted of contempt because he issued a news release to the effect that at the preliminary examination in the Senff case a fireman testified to his being called to the Senff home in the early morning hours of July 8, 1970 and to his observations and actions at the time, that a doctor from the coroner's office testified relative to the cause of death of the three victims, that Jenny Senff testified to her observations on the night in question, that another doctor testified concerning his examination of Jenny, that a deputy sheriff testified as an expert concerning the cause of a fire, that a police officer testified to certain statements made by Senff before his arrest[20] and that other evidence was introduced from other witnesses which satisfied the magistrate that Senff should be held for trial on three counts of murder, one count of attempted murder and one count of arson.

While one must agree with Judge Smith that Younger's press release was at least a technical violation of that portion of the order which prohibited "any statement outside of court as to the nature, substance or effect of any testimony that has been given," no plausible argument can be made that an order purporting to prohibit nonprejudicial, "sterile"—to use Judge Smith's own apt description—statements of that kind should be upheld. Any power to interfere with everybody's basic right to communicate which may inhere in a court for the purpose of insuring a fair trial to a defendant accused of crime is necessarily limited by its justification. When that court correctly determines that a particular utterance has no tendency to prejudice a pending criminal prosecution, but nevertheless punishes the utterer because he is in literal or technical violation of an order designed to curb potentially prejudicial pretrial publicity, the court inferentially admits that the order covers more ground than the First Amendment allows—that it is overbroad.

This does not necessarily mean that the order was totally void. In the Busch matter we will examine the legal effect of an overbroad protective order with respect to disseminations which the order may constitutionally reach. For present purposes it is enough to state and apply the obvious: that a conviction based on speech which the Constitution immunizes,

order prohibiting the dissemination of information issued by the magistrate in this matter was invalid, not merely a ruling that these issues need not be resolved now because, before they can be resolved, appellant must be given a fair hearing."

[20] In making an argument that, in spite of Judge Smith's findings, Younger's press release was potentially prejudicial, respondent points out that one newspaper article comments: "It is believed that incriminating statements by Senff led to his arrest and the filing of murder charges." Assuming that this flight of journalistic fancy was provoked by the disclosure that Sergeant Rucker testified to certain prearrest statements by Senff, the potential prejudicial effect of this comment is obviously somewhere between nil and zero.

cannot stand unless there is a procedural reason why a person so convicted cannot rely on his constitutional rights.[21]

Respondent argues that Younger placed himself in such a position by deliberately bypassing all opportunities to seek a vacation or modification of the protective order.[22]

At first blush one would say that *In re Berry,* 68 Cal.2d 137 [65 Cal. Rptr. 273, 436 P.2d 273], is dispositive of the problem. In that case the superior court issued a temporary restraining order prohibiting certain activities in connection with a threatened labor dispute. The persons who eventually became the petitioners in *Berry* violated certain provisions of the order without ever having moved the court to have it vacated or modified. In response to their petition for a writ of habeas corpus, pending a charge for criminal contempt, it was argued that the petitioners' failure to seek vacation or modification "through available legal means prior to their willful violation . . . precludes their mounting a constitutional challenge in the context of contempt proceedings resulting from such disobedience." (*In re Berry, supra,* 68 Cal.2d at p. 146.)

Without tracking or paraphrasing the reasoning by which the Supreme Court rejected the respondent's position, we merely quote its summary of California law on the point: ". . . In this state a person affected by an injunctive order has available to him two alternative methods by which he may challenge the validity of such order on the ground that it was issued without or in excess of jurisdiction. He may consider it a more prudent course to comply with the order while seeking a judicial declaration as to its jurisdictional validity. (See *Mason* v. *United States Fid. & Guar. Co.* (1943) 60 Cal.App.2d 587, 590-591 [141 P.2d 475].) On the other hand, he may conclude that the exigencies of the situation or the magnitude of the rights involved render immediate action worth the cost of peril. In the latter event, such a person, under California law, may disobey the order and raise his jurisdictional contentions when he is sought to be punished for such disobedience. If he has correctly assessed his legal

---

[21]See *In re Kay,* 1 Cal.3d 930, 946-947 [83 Cal.Rptr. 686, 464 P.2d 142], where the Supreme Court, without permitting a retrial, overturned a conviction under section 403 of the Penal Code. As interpreted by the trial court, section 403 was overbroad in that it encompassed constitutionally protected conduct. Petitioners' conduct was covered by the section's overbreadth, just as Younger's news release was speech which the protective order purported to, but could not reach.

[22]We, in turn, deliberately bypass certain super-sophisticated issues tendered by the parties, which relate to the question of jurisdiction to modify or vacate at the relevant time: after the magistrate had bound Senff over for trial in the superior court, but before an information was filed there.

position, and it is therefore finally determined that the order was issued without or in excess of jurisdiction, his violation of such void order constitutes no punishable wrong. (See *Kreling* v. *Superior Court* (1941) 18 Cal.2d 884 [118 P.2d 470]; *In re Carroll* (1933) 135 Cal.App. 672, 677 [28 P.2d 84]; *Chaplin* v. *Superior Court* (1927) 81 Cal.App. 367, 378 [253 P. 954]; cf. *In re DeSilva* (1948) 33 Cal.2d 76, 79 [199 P.2d 6]; see also 1 Witkin, Cal. Procedure (1954) § 155, p. 422.) If, however, the final judicial determination is otherwise he may be punished." (*In re Berry, supra,* 68 Cal.2d at pp. 148-149.)

Respondent's arguments that the second option recognized by *Berry* does not apply to Younger do not persuade us. Respondent first quotes extensively from *People* v. *Watson,* 15 Cal.App.3d 28, 40-42 [92 Cal. Rptr. 860]. A mere glance at the case and at the context in which the language relied on by respondent was used, makes it obvious that it can have no application to our problem. At most it suggests that situations may arise where the alleged contemner's conduct in connection with the promulgation of a court order which he is charged with violating, estops him from claiming the benefit of the *Berry* rule.

In arguing that Younger's conduct in this case does so estop him, respondent stresses the fact that it appeared from his telephone conversation with Judge Smith that the last thing he wanted was a modification of the protective order. We are asked to infer that Younger was determined to go the contempt route, when he could have achieved his objective by less drastic means.

Taken out of context, this argument seems plausible. Other factors, however, must be considered.

First: right or wrong, Younger had long before the Senff case taken a public stand against protective orders or, more accurately perhaps, certain problems with respect thereto which he felt impinged on the proper exercise of his function as district attorney. As noted he had been frustrated in his attack on the order which followed the assassination of Senator Kennedy. His unhappiness was memorialized in a widely read article. (Younger, *Fair Trial, Free Press and the Man in the Middle,* 56 A.B.A.J. 127.) He was not really fighting Judge Smith but "them."

Second, the nature of the press release which Younger eventually issued makes it clear why he did not want a modification: he thought he could test the validity of the protective order by an innocuous release which hurt no one, but would nevertheless force the courts to decide the issue with something other than postcards. He obviously did not want to be in

a position where, in order to test the validity of the protective order by violating it, he would actually have to say something which could jeopardize a conviction in People v. Senff.

We find nothing in Younger's conduct which would estop him from relying on Berry.

To be sure, on Younger's appeal we never do reach the basic issues he hoped to raise by the release of August 17.[23] That, however, does not prove his inability to rely on the Berry principle. It is, rather, the result of our application of the rule that courts should not decide more than the occasion demands. A sterile press release simply is not a good vehicle with which to make law to the effect that courts are powerless to prevent harmful or potentially harmful publications by prior restraints.

The superior court should have annulled the contempt judgment against Younger.

## II.

### Times Mirror Company v. Superior Court

■ The legal literature concerning freedom of the press needs no enrichment by yet another panegyric. Those who do not believe that a free press is one of the cornerstones of this republic, will not be swayed by us; those who do, need no refresher.

We do not for one moment suggest that the respondent court was insensitive to free press or free speech values. We do not hesitate, however, to hold that neither Antelo, as the real party in interest here and movant in the respondent court, nor the court itself, have carried the " 'heavy burden of showing justification for the imposition' " of a prior restraint in this case. (*New York Times Co.* v. *United States,* 403 U.S. 713, 714 [29 L.Ed.2d 822, 825, 91 S.Ct. 2140].)

There is' no need to belabor the obvious: that the tragic facts of the homicide with which Antelo is charged provoked an immediate public outcry and fairly extensive news coverage. Further, it is clear that, unchecked, continued news coverage of the nature which was before the respondent court carried, to put it mildly, a potential of prejudice.[24]

---

[23]In fact, the fundamental legal proposition which he apparently wanted to vindicate by violating respondent's order, we decide adversely in connection with the Busch petition.

[24]We fully appreciate that the effect of the pendency of a test case may be perverse. It is our personal recollection that after the promulgation of the order at least

On the other hand there is no necessary correlation between the depth of a tragedy in human terms and its continued newsworthiness. The homicide of Joyce Huff was not a matter of national or even state-wide concern. Obviously it was of far less interest than the murder of Marilyn Sheppard, yet in *Sheppard* v. *Maxwell,* 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507], the Supreme Court brushed aside any consideration of the question what, if any, sanctions are available against "a recalcitrant press," by concluding that less drastic measures "would have been sufficient to *guarantee* Sheppard a fair trial. . . ." (*Sheppard* v. *Maxwell, supra,* 384 U.S. at p. 358 [16 L.Ed.2d at p. 617]. Italics added.)

Quite apart from the fact that the amount of pretrial publicity in *Sheppard* dwarfed the media coverage in People v. Antelo, there is also the vital difference of tone. Much of the pretrial publicity in *Sheppard,* both before and after Sheppard's arrest, was openly hostile to the defendant. On the other hand, none of the news items brought to our attention in connection with People v. Antelo bears the stamp of a vendetta against the persons accused of the Huff homicide. *Sheppard* makes this an a fortiori case.

In holding, as we must, that the direct restraint against the media was impermissible, we fully recognize that the judge who promulgated it is closer to the situation than we are. Antelo and his codefendant were arraigned in a branch of the Los Angeles County Superior Court which is located near the community where the homicide was committed. Presumably the news value of the alleged crime was more intense in the communities near its commission. Very probably the citizens there will continue to be interested in the Huff tragedy long after people elswhere will want their appetite for news fed by new horrors.

We also realize it is difficult to put between the covers of the record in a court such as ours all of the many factors, some perhaps subconsciously assimilated, which cause a trial judge familiar with local conditions to make a present determination with respect to future publicity which may affect the fairness of a trial. This does not, however, relieve us of our constitutional duty, in cases such as this, to make an independent assessment of the facts. (*L. A. Teachers Union* v. *L. A. City Bd. of Ed.,* 71 Cal.2d

one newspaper immediately announced that it intended to violate it for the purpose of testing its legality. We also recall reading at least one item which was apparently published in defiance of the order. There may have been others. On the other hand we have not read or heard any news items concerning the Huff homicide itself—as distinguished from this proceeding—since we stayed the effect of the respondent court's order with respect to the press. We realize that lack of newsworthiness may not be the sole reason for this silence.

551, 557 [78 Cal.Rptr. 723, 455 P.2d 827]; *Zeitlin* v. *Arnebergh,* 59 Cal.2d 901, 909 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707].) Furthermore, it is perhaps of some advantage not to be too close to the scene. Before it is even appropriate to think about a change of venue to another county—a subject on which we express no view—one must not forget that the homicide occurred in a relatively small community in a county with a population of over seven million people. (Gov. Code, § 28020.) This certainly is a fact which we must consider when deciding whether People v. Antelo called for direct restraints, when the Supreme Court did not even think that such restraints were worth discussing in *Sheppard,* a case of nation-wide interest.

In view of the fact that we find that People v. Antelo is not an appropriate vehicle with which to encroach upon the freedom of the press to publish news, we make only passing reference to the only authority cited in support of the portion of the order affecting the media: it is a dictum in *Branzburg* v. *Hayes,* 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646]. *Branzburg,* of course, has nothing to do with any of the issues before us. It did deal with the obligation of newspaper reporters to identify their sources in response to relevant questions during grand jury investigations. In the course of arriving at its conclusion that there was such a duty the Supreme Court surveyed the position of the press in our society. In the course of that survey it said that the First Amendment "does not guarantee the press a constitutional right of special access to information not available to the public generally." It pointed out that the press was excluded from grand jury proceedings and other meetings of public bodies as well as some meetings of private organizations. It continued: ". . . Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, *and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal.* In *Sheppard* v. *Maxwell,* 384 U.S. 333 (1966), for example, the Court reversed a state court conviction where the trial court failed to adopt 'stricter rules governing the use of the courtroom by newsmen, as Sheppard's counsel requested,' neglected to insulate witnesses from the press, and made no 'effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides.' *Id.,* at 358, 359. '[T]he trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters.' *Id.,* at 361. . . ." (*Branzburg* v. *Hayes,* 408 U.S. at pp. 684-685 [33 L.Ed.2d at pp. 641-642]. Italics added.)

The emphasized portion of this dictum is, to be sure, a puzzler. It would

be presumptuous of us to suggest that it does not follow from anything which that court said, held or intimated in *Sheppard*.[25] Whether it is an indication of what the constitutional future holds for us or whether it will be relegated to the status of inadvertent dictum dropped in the course of a very long opinion, we do not know. The needs of this case are amply satisfied by our holding that the record does not permit the prior restraint imposed on the media.

The jurisdiction of courts to make pretrial protective orders rests squarely on their implied and inherent powers. The necessity for such powers is well recognized. We do not deny it. Indeed our decision in the third consolidated matter, the Busch petition, rests on the application of such powers. At the same time, we must recognize that the concept of implied and inherent powers poses great dangers when, of necessity, their definition and application is in the hands of those who wield them. Judicial supremacy must rest on respect, not fear. Materially courts are the most impotent branch of government. If, through lack of restraint and by attempting to increase their powers unnecessarily, they lose the respect which makes them effective, they may soon find that, as a practical matter, even powers that are now conceded to them, are unenforceable.

## III.

### Busch v. Superior Court

Before we come to grips with Busch's attack on the order in People v. Antelo, several matters should be noted.

1. First and foremost, he does not dispute that the respondent court has the power to attempt to secure a fair trial by making appropriate orders. Neither does he dispute that, at least in theory, such orders may be directed at the prosecutor. This is entirely appropriate. The basic question of the propriety of a prior restraint against an officer of the court, such as the prosecutor, is not debatable at our level. Quite apart from another a fortiori holding—*Hamilton* v. *Municipal Court*, 270 Cal.App.2d 797 [76 Cal.Rptr. 168]—it simply is impossible for us to believe that in *Sheppard* eight members of the Supreme Court[26] agreed on page after page about what the trial

---

[25]True, *Sheppard* had a lot to say about the constitutional right of newsmen to access to news. On the other hand our repeated reading of the decision fails to uncover anything about prohibiting newsmen from publishing information about trials. We appreciate that nothing in the order under consideration purports to prevent media representatives from attending the trial or any preliminary skirmish, or to prohibit them from publishing what transpires in open court. The *Branzburg* dictum goes further than the order under review.

[26]Justice Black dissented without opinion.

judge should have done, without considering whether the First Amendment would have permitted him to do it. (See also *Frazier* v. *Superior Court,* 5 Cal.3d 287, 292 [95 Cal.Rptr. 798, 486 P.2d 694].)

2. Prosecutors, of course, do not lose their First Amendment rights when they assume office. (Cf. *Garrison* v. *Louisiana,* 379 U.S. 64 [13 L.Ed.2d 125, 85 S.Ct. 209].) We recognize that much in *Younger.* They are, however, elected or appointed to prosecute criminal cases, rather than to talk about them. By taking office they necessarily accept certain limitations.[27] Their constituents may properly expect that they cooperate in the courts' efforts to avoid frustration of successful criminal prosecutions, by inhibiting conditions which prevent fair trials and call for mistrials or reversals. No sensible argument can be made that if it is essential to a public official's successful performance that he limit himself in his speech, he nevertheless has an absolute constitutional right to go on speaking. Thus, when Congress concluded that such a prohibition was necessary for the integrity and efficiency of the civil service, a simple mechanic could constitutionally be prevented from engaging in political activity just because he worked for the United States Mint. (*United Public Workers* v. *Mitchell,* 330 U.S. 75, 94-104 [91 L.Ed. 754, 769-775, 67 S.Ct. 556].) Surely, then a state may try to preserve the integrity and efficiency of its administration of criminal justice by attempting to forestall the prejudicial effect of some prosecutors' fondness for publicly talking shop.

3. Of course, Busch claims no right to make prejudicial pretrial statements. Reducing his legal position to the human level, he seems to resent being ordered not to do something which he would not do anyway. This is understandable.

As will be seen, however, this posture raises false issues. The respondent court's order never mentioned Busch by name. A prejudicial news release by the greenest lawyer on his huge staff may prejudice a criminal trial just as much as a statement by Busch himself.[28]

---

[27]So do all of us. No member of this court could hope to escape appropriate sanctions if he treated the press to a running commentary on our deliberations on a case which is under submission.

[28]Although the prayer of the Busch petition asks us to direct the respondent court to refrain from carrying out its threat "to hold *any* person who violates [the] order in contempt," the petition and the supporting arguments—except for an attack on the portion of the order directed to the media—are presented entirely from the prosecutor's point of view. A casual glance at the order reveals that it is addressed to many other persons, such as the defendants, defense counsel, "any other attorney," judicial employees, law enforcement personnel and witnesses. Without intimating in the least that a different result would follow if, for example, "any other attorney," a

  4. While Busch attacks the order on several procedural and substantive grounds, his objections are to the order as a whole, rather than to specific parts.[29] We therefore have no occasion to decide whether the order may have gone too far in certain particulars.[30]

## A.

With this preface we turn to the issues raised by the Busch petition. The first three may conveniently be considered together. Busch claims that the trial court did not adequately articulate the justification for the order, that any justification must be found in a "clear and present danger to the administration of justice"[31] and that, in any event, it appears that whatever evidence was before the respondent court would not have sufficed for a finding of a clear and present danger.

█ Adverting to the first of these contentions, it certainly appears from the record as a whole that the respondent court more than adequately articulated what it deemed to be the justification for its order. Perhaps certain procedural niceties appropriate to the preparation of findings of fact and conclusions of law in an ordinary civil action were not observed. Such considerations are, however, beside the point if we appreciate that protective orders are not civil judgments granting permanent injunctions, but incidental tools which courts must use to "guarantee"—the mandate of *Sheppard*—fair trials in criminal cases. Such orders must be fashioned according to the necessities of the moment. Nobody would contend that a magistrate, on being advised that a person accused of murdering a prominent political figure such as Senator Kennedy was to be arraigned before him, cannot issue a protective order without evidence that the crime is of public interest.

---

prospective witness or the defendant Hernandez were to challenge the order, we merely note that we do not decide the impact of the order on anyone but the prosecutor. (Cf. *Chase* v. *Robson,* 435 F.2d 1059.)

[29]Even the attacks on the grounds of vagueness and overbreadth are fashioned to invalidate the order as a whole, rather than particular portions thereof. (Cf. *Castro* v. *Superior Court,* 9 Cal.App.3d 675, 702-704 [88 Cal.Rptr. 500].)

[30]One does not have to flyspeck the order to find isolated provisions which may prove troublesome if put under a legal miscroscope. For example: the prohibition against public dissemination covers, among many other matters, ". . . any evidence, *the admissibility of which may have to be determined by the Court* . . ." (Italics added.) The problems which the qualifying phrase may engender are obvious.

[31]At times the suggested test is a "clear and present danger *of a serious and imminent threat* to the administration of justice." It does not appear that Busch feels that the addition of the italicized words makes a difference. The genesis of the phrase appears to be *Chase* v. *Robson,* 435 F.2d 1059, 1061, where the court, in a dictum, combined the "clear and present danger" test with one used in *Craig* v. *Harney,* 331 U.S. 367, 372 [91 L.Ed. 1546, 1550, 67 S.Ct. 1249].

Neither the situations which justify such orders nor the orders themselves are static. If it appears that in making its initial order the court reached for a shotgun to kill what has turned out to be a gnat, or that particular provisions of the order are unnecessary or disproportionately irksome, the order is always subject to summary modification, even on the court's own initiative.

■ The question of the correct constitutional standard by which we must judge whether the restrictions on free speech which necessarily inhere in any protective order are justified, is much on the minds of the parties. Their arguments more or less boil down to a choice between a "clear and present danger to the administration of justice"—Busch—versus a "reasonable likelihood of publicity tending to prevent a fair trial"—the respondent court.[32]

We agree that no compelling holding points to either test as the correct one. The snippets from *Sheppard* to which the briefs refer over and over are quite inconclusive. *Hamilton* v. *Municipal Court,* 270 Cal.App.2d 797 [76 Cal.Rptr. 168] does purport to apply the "clear and present danger" test, but finds it satisfied. The case is therefore not conclusive on the question whether nothing but a "clear and present danger" test will do. *Crosswhite* v. *Municipal Court,* 260 Cal.App.2d 428 [67 Cal.Rptr. 216] also considered the "clear and present danger" criterion, but actually held that the publication there under consideration posed no danger at all. In any event, neither case involved an attack on a protective order by the prosecutor. The question may fairly be said to be open.

Before deciding the issue, it is well to remember the type of situation with which we deal.

We are not concerned with the question of what criterion to apply to past utterances, where we know their contents and the circumstances under which they were made. We are faced with a prior restraint, which can only define and describe the speech it prohibits. It cannot quote it. This is not just a source of constitutional doubt—resolved for us by *Sheppard*—it is also a fact of legal life against which the practicality of any test must be mirrored.

Usually judges are faced with the question whether to issue a protective order at a very early stage in a criminal prosecution. Many of the factors which militate in favor of such an order can only be dimly perceived. The

---

[32]Obviously both tests can be phrased in slightly varying ways. Both tests, however, seek to strike a balance between the same competing—though not necessarily clashing—values: the right of free speech and the right to a fair trial.

judge may, of course, have a vague idea bout the case's potential as a trigger for prejudicial news. He probably knows something about the seriousness of the crime, the character, prominence or notoriety of the principals, and can guess at the newsworthiness of the proceedings from whatever publicity the case has already engendered. That, however, is about it. Even if they know, none of the parties subject to a proposed protective order will tell him just what information they intend to publicize in the future.

One vital fact which the judge will want to know, no one is likely to answer: where is the case going to be tried? It so happens that in People v. Antelo the defendant made an early request for a change of venue. In many cases—particularly if there has been no prejudicial publicity as yet—that is a legal move which may or may not be made in the future. One thing, however, is certain: no change of venue can be forced down the defendant's throat. (*Jackson* v. *Superior Court,* 13 Cal.App.3d 440 [91 Cal.Rptr. 565, 46 A.L.R.3d 290].) Under the circumstances the judge has little choice but to assume prophylactically that the case will be tried where the alleged crime was committed, which is usually the locality where prejudicial publicity is likely to be heaviest. This is so, although as a realist he may be quite certain that when the chips are down the defendant will have to move for a change of venue and that he will have to grant it.

It would be a waste of space to go on detailing the factors, many lying far in the future, which may affect the fairness of the eventual trial. Every lawyer and judge familiar with these matters can make his own list. We merely wish to make two points: the first is that protective orders must be geared to the apparent needs of the moment and their validity must be judged with that necessity in mind. That is also why, as we have noted, they are subject to review and modification when circumstances change. The second is this: since the assessment of the need for a protective order must take so many uncertain factors into account, pedantic appellate debates over the correct criterion are good clean fun for those who enjoy that sort of thing, but of precious little help to the trial judge who must silence the sources of prejudicial pretrial publicity as soon as possible, or risk spending weeks or months trying a case which is doomed to be reversed, should it result in a conviction.

Nevertheless, since we are asked to hold that the protective order under consideration was not justified by the facts as they appeared on August 11, 1972, we should state by what test we conduct our examination. We have no illusions that applying the facts of People v. Antelo against either test is a mechanical process. Value judgments are necessarily involved.

Indeed—depending perhaps on how protective toward the administration of justice one feels—it seems not too fanciful to announce that the two tests are really one: a reasonable likelihood of an unfair trial is, in itself, a clear and present danger to the administration of justice.

The "clear and present danger" test never has been the universal solvent of First Amendment problems which it is popularly thought to be. Although during the last dozen years freedom of expression has, on the whole, enjoyed a very good run in the United States Supreme Court, that court has not expressly applied the clear and present danger test, in any context, since it decided *Wood* v. *Georgia,* 370 U.S. 375 [8 L.Ed.2d 569, 82 S.Ct. 1364], in 1962. Even before then, the very case which announced it, *Schenck* v. *United States,* 249 U.S. 47, 50-51 [63 L.Ed. 470, 472-473, 39 S.Ct. 247], did not apply it; the test was finessed in *Gitlow* v. *New York,* 268 U.S. 652, 668-671 [69 L.Ed. 1138, 1146-1148, 45 S.Ct. 625], apparently found unnecessary to sustain First Amendment claims in a whole series of cases (e.g. *Talley* v. *California,* 362 U.S. 60 [4 L.Ed.2d 559, 80 S.Ct. 536]; *Smith* v. *California,* 361 U.S. 147 [4 L.Ed.2d 205, 80 S.Ct. 215]; *Speiser* v. *Randall,* 357 U.S. 513 [2 L.Ed.2d 1460, 78 S.Ct. 1332]; *Saia* v. *New York,* 334 U.S. 558 [92 L.Ed. 1574, 68 S.Ct. 1148]; *Marsh* v. *Alabama,* 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276]; *Tucker* v. *Texas,* 326 U.S. 517 [90 L.Ed. 274, 66 S.Ct. 274]; and *Fiske* v. *Kansas,* 274 U.S. 380 [71 L.Ed. 1108, 47 S.Ct. 655]), probably diluted in *Dennis* v. *United States,* 341 U.S. 494 [95 L.Ed. 1137, 71 S.Ct. 857],[33] paid lip service in *Feiner* v. *New York,* 340 U.S. 315 [95 L.Ed. 295, 71 S.Ct. 303], held inapplicable for one reason or another in such cases as *Communications Assn.* v. *Douds,* 339 U.S. 382, 394-399 [94 L.Ed. 925, 941-944, 70 S.Ct. 674] and *Beauharnais* v. *Illinois,* 343 U.S. 250, 266 [96 L.Ed. 919, 932, 72 S.Ct. 725] and replaced, at least in part, by the balancing technique (e.g. *Barenblatt* v. *United States,* 360 U.S. 109, 126-134 [3 L.Ed.2d 1115, 1128-1133, 79 S.Ct. 1081]; Frantz, *The First Amendment in the Balance,* 71 Yale L.J. 1424). Clearly, solving First Amendment problems has always been more complex than just talking about "clear and present danger" or "falsely shouting fire in a theatre."

Nevertheless the Supreme Court did rely on the "clear and present danger" test in *Wood* v. *Georgia,* 370 U.S. 375 [8 L.Ed.2d 569, 82 S.Ct. 1364]. That case is a lineal descendant of *Bridges* v. *California,* 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346]; *Pennekamp*

---

[33]Mendelson, *Clear and Present Danger—From Schenck to Dennis,* 52 Colum.L. Rev. 313, 330; Gorfinkel and Mack, *Dennis* v. *United States and the Clear and Present Danger Rule,* 39 Cal.L.Rev. 475; Emerson, The System of Freedom of Expression, pages 112-121.

v. *Florida,* 328 U.S. 331 [90 L.Ed. 1295, 66 S.Ct. 1029] and *Craig* v. *Harney,* 331 U.S. 367 [91 L.Ed. 1546, 67 S.Ct. 1249]. While these cases all dealt generally with the problem of free speech in relation to the administration of justice, they involved the possibility of coercion and intimidation through criticism, rather than lack of impartiality because of publicity—the danger against which protective orders are directed.

In all four cases the targets of the criticism were judges.[34] In each case a clear and present danger to the administration of justice was found to be lacking because of the intestinal fortitude with which the Supreme Court credited the judiciary in general and the respective targets of the criticism in particular. These findings were, in each case, based on scrutiny of the particular utterances involved. Obviously no court can examine speech which has not yet been uttered.

We do not, however, rest our belief that the *Bridges-Pennekamp-Craig-Wood* line of cases does not compel the application of a "clear and present danger" test to protective orders, on those grounds alone. The very language of the Supreme Court in *Wood* v. *Georgia, supra,* undermines petitioner's reliance on that case. For there the court goes to great pains to point out that the facts do "not represent a situation where an individual is on trial" and that it therefore, "need not pause . . . to consider the variant factors that would be present in a case involving a petit jury." (*Wood* v. *Georgia,* 370 U.S. at p. 389 [8 L.Ed.2d at p. 580].) Both these factors are present here.

We have reached the conclusion that the "clear and present danger" test is inappropriate as a criterion for the validity of protective orders, not so much because it is too restrictive, but because it is irrelevant.

If any single case of the past can be said to have embraced the "clear and present danger" test, it was *Bridges* v. *California,* 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346], where it was lauded as affording "practical guidance in a great variety of cases" involving the scope of freedom of expression. (*Id.,* p. 262 [86 L.Ed. pp. 202-203].) It was also characterized as a "working principle that the substantive evil must be extremely serious and the degree of imminence extremely high" before speech can be punished. (*Id.,* p. 263 [86 L.Ed. p. 203].) Presumably then, if the test is not "practical" and is inherently incapable of "working,"

---

[34]*Wood* v. *Georgia* also presented an issue of influencing the administration of justice through a grand jury. The Supreme Court went to great pains to point out that no evidence had been offered that the proceedings of that body had actually been hindered or obstructed.

but the court nevertheless is under a constitutional duty to curb speech to combat the evil of an unfair trial, the test is irrelevant. Some other yardstick will have to be found.

We believe that the United States Court of Appeals for the Tenth Circuit was correct when, in *United States* v. *Tijerina,* 412 F.2d 661, 666, it rejected the "clear and present danger" test.

"Counsel attack the order on the ground that it is not based on a clear and present danger. The order is based on a 'reasonable likelihood' of prejudicial news which would make difficult the impaneling of an impartial jury and tend to prevent a fair trial. *We believe that reasonable likelihood suffices.* The Supreme Court has never said that a clear and present danger to the right of a fair trial must exist before a trial court can forbid extrajudicial statements about the trial." (*United States* v. *Tijerina,* 412 F.2d 661, at p. 666. Italics added.)

The "reasonable likelihood" test applied in *Tijerina* is identical with the test which the California Supreme Court enjoins us to apply with respect to motions for change of venue in criminal cases. (*Maine* v. *Superior Court,* 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372].) While it is fully appreciated that granting a motion for a change of venue does not involve the sacrifice of free speech values,[35] we are persuaded by the holding of the *Tijerina* court, that the First Amendment does not stand in the way of judging the propriety of protective orders by the same test.[36]

We have already pictured the typical situation in which a trial judge must decide whether or not to issue a protective order. To ask him to

[35]On the other hand it will not do to shrug off a defendant's plea for a protective order by telling him not to worry about local publicity, however extensive, since he can always move for a change of venue. It is clear that trial in the locality where the crime was allegedly committed has traditionally been felt to be a substantial right, whether of constitutional magnitude or not. (See *People* v. *Powell,* 87 Cal. 348, 354-360 [25 P. 481]; cf. U.S. Const., Amend. VI: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, . . .")

[36]We emphasize what needs no emphasis: what we are discussing is the standard applicable to the propriety of protective orders insofar as they are directed against the prosecutor and his staff, officers of the court. Quite conceivably a different standard might be applicable to the defendant himself. Indeed, *Hamilton* v. *Municipal Court,* 270 Cal.App.2d 797 [76 Cal.Rptr. 168] did involve the impact of a protective order on the defendant. If it be thought that *Hamilton* did actually hold that a clear and present danger test was appropriate, it should be remembered that there the contemner was not an officer of the court, but an unwilling party.

Further, it should be obvious that nothing we say here with respect to the appropriate criteria for protective orders against prosecutors and others involved in the criminal trial, should ever be read as being in the least relevant if and when a court one day should decide that orders directed to the press are sometimes proper.

determine the need for such an order by a finding that the situation presents a clear and present danger to the administration of justice, is simply to require him to palm off guesswork as finding. It would put a premium on hypocritical adherence to an abstract formula.

The virtue of the "reasonable likelihood" test is, therefore, honesty. It recognizes that the court is dealing with contingencies, rather than realities. It does not demand impossible feats of clairvoyant fact finding: for example, a finding that future publicity presents a clear and present danger to the administration of justice, when the court does not even know where the case will be tried! A "reasonable likelihood" test, on the other hand, permits the court to consider openly and frankly the many future variants which collectively may amount to a reasonable likelihood but, by their very contingent nature, can never amount to a clear and present danger— unless, of course the meaning of that term is to be so diluted as to make it indistinguishable from its rival criterion.

We are satisfied that in the hands of a conscientious judge the "reasonable likelihood" test will not lead to abuse.

■ We have independently reviewed the entire record with the "reasonable likelihood" test in mind. (*L. A. Teachers Union* v. *L. A. City Bd. of Ed., supra,* 71 Cal.2d 551, 557; *Zeitlin* v. *Arnebergh, supra,* 59 Cal.2d 901, 909.) We are of the opinion that the nature of the publicity given to the Huff homicide provided ample justification for the order when it was made. The extensively publicized shotgun killing of a four-year-old girl in front of or near her home is bad enough. If one adds media speculation of a direct connection between that homicide and a previous one, coupled with allusions to gang warfare, it was certainly "reasonably likely" that prejudicial pretrial publicity would ensue.

We recapitulate: These are not static situations. What may have been reasonably necessary last August, may not seem appropriate today. Protective orders are subject to continuing review based on changed conditions and, in some cases perhaps, on the mere passage of time. Petitioner is free to bring any changed circumstances to the attention of the respondent court.[37]

### B.

■ Next Busch contends that the trial court should not have subjected him to the publicity order, since none of the evidence before it indicated publicity traceable to his office.

---

[37]We are not unmindful of the somewhat artificial conditions created by the pendency of these proceedings in this court.

The asserted fact appears to be substantially true. The conclusion, however, does not follow. A publicity order is preventive, not punitive. To say that the respondent court could have acted against Busch and his over 400 deputies only if a prior record for the release of prejudicial publicity in this particular case had been established, would make it possible to lock the barn before the theft of the horse.

### C.

■ Finally we reach the argument that the order was impermissibly vague and overbroad.

As promulgated the order is certainly not vague. Indeed, apart from the heading of that portion of petitioner's brief, no argument to that effect is put forward.

This does not solve the other problem: while the breezy command to "shut up" is admirably certain, it may be overbroad.

We have no doubt that literally read the order in People v. Antelo is just as overbroad as the one which Younger tested in People v. Senff. It requires no imagination to posit literal violations which can have no possible effect on the fairness of the forthcoming trial in People v. Antelo. This literal overbreadth, however, does not invalidate the order if the overbroad applications can be removed by construction. (*In re Berry*, 68 Cal.2d 137, 156-157 [65 Cal.Rptr. 273, 436 P.2d 273].) This is easily accomplished by construing the order to refer only to disseminations which have a reasonable likelihood of prejudicing the administration of justice in People v. Antelo.[38] Since such a judicial construction removes the chilling effect on protected speech which usually makes overbroad orders totally void, the order is enforceable with respect to publications which the respondent court may constitutionally forbid. (Cf. *Dombrowski* v. *Pfister*, 380 U.S. 479, 491 [14 L.Ed.2d 22, 31, 85 S.Ct. 1116].)

This construction, of course, immediately raises the specter of vagueness

---

[38]In *Berry* the Supreme Court found itself unable to save the order in question by construction. In *In re Kay*, 1 Cal.3d 930, 943 [83 Cal.Rptr. 686, 464 P.2d 142], it did, however, so construe section 403 of the Penal Code as to preserve its constitutionality. That section makes it illegal to disturb a public meeting. The court held the section to be constitutional, if interpreted to require proof that "the defendant substantially impaired the conduct of the meeting by intentionally committing acts in violation of implicit customs or usages or of explicit rules for governance of the meeting, of which he knew, or as a reasonable man should have known." We do not believe that our modification of the respondent court's order should pose more problems in enforcing it, than did the Supreme Court's interpretation of section 403 with respect to that statute.

which caused us no problem with the precise but overbroad order as promulgated. Several factors, however, compel a holding that even as construed by us the order is not too vague.

The question of vagueness cannot be viewed in a vacuum.

Foremost and decisive is the fact that were we to hold the protective order, as construed, to be impermissibly vague, we would not know how to draw one which is more certain. Any such order must of necessity cover the infinite variety of ways and means in and by which prejudicial utterances can be made and the many avenues through which a future jury can be prejudiced by speech which the court can prohibit. It is respectable constitutional doctrine that vagueness does not vitiate where the command is as specific as circumstances permit. (*FTC* v. *Colgate-Palmolive Co.*, 380 U.S. 374, 393 [13 L.Ed.2d 904, 918-919, 85 S.Ct. 1035]; see also *Boyce Motor Lines* v. *United States,* 342 U.S. 337, 340 [96 L.Ed. 367, 371, 72 S.Ct. 329].) Of course there will be cases close to the line. There always are. "Condemned to the use of words, we can never expect mathematical certainty from our language." (*Grayned* v. *City of Rockford,* 408 U.S. 104, 110 [33 L.Ed.2d 222, 228-229, 92 S.Ct. 2294]; see also *Cameron* v. *Johnson,* 390 U.S. 611, 615-616 [20 L.Ed.2d 182, 186-188, 88 S.Ct. 1335]; cf. *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33, 38-39 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

Further we point out that the order contains a broad list of exceptions relating to future communications which the respondent court obviously thought to be vital to the prosecution and defense. The exceptions are not attacked for vagueness. Petitioner is at all times free to seek a modification of the order if he feels that the list of excepted communications is not broad enough to permit him to prepare the criminal case for trial. Thus any utterance which is important to accomplish the primary purpose of petitioner's connection with the case—its prosecution—is either excepted from the protective order altogether or may be excepted if certain facts are brought to the attention of the respondent court.

The protective order, as construed is not impermissibly vague.

## IV.

### Disposition

In *Younger* v. *Smith* the judgment of the superior court affirming the petitioner's contempt conviction is reversed.

In *The Times Mirror Company* v. *Superior Court,* let a peremptory writ

of mandate issue, ordering the respondent court to vacate those portions of its order of August 11, 1972, directed to "all agencies of the public media, including written publications, radio, and television, their respective reporters, editors, publishers, and other agents."

In *Busch* v. *Superior Court* the petition is denied.

The alternative writs heretofore issued are discharged.

Aiso, J., and Cole, J.,* concurred.

A petition for a rehearing in No. 40879 was denied February 8, 1973, and the petition of real party in interest Antelo for a hearing by the Supreme Court in No. 40879 was denied March 23, 1973.

APPENDIX A

[Order of August 11, 1972.]

"An information having been filed in this cause by the District Attorney on August 2, 1972, after the defendants were bound over to this Court; and on said date of August 2, 1972, the defendants were arraigned and pleas of 'not guilty' were entered on behalf of the defendants before the undersigned. At said arraignment hearing, counsel for the defendant DONALD PAUL ANTELO made oral request for a protective order with respect to pre-trial publicity, to apply not only to principals and representatives in these proceedings, but to the various news reporting and disseminating media. The Court thereupon indicated that a protective order would be made in the premises, requested counsel to present their written views on the subject, and instructed all persons and participants in the proceedings to refrain from any publicity-generating activities or statements pending issuance of this Court's order on the subject. The People have presented two briefs, (filed as Pre-trial Exhibits I and II in these proceedings) counsel for the defendant DONALD PAUL ANTELO has presented two communications dated August 10 and August 11, 1972, respectively, with appended enclosures, (filed as Pre-trial Exhibits III and IV in these proceedings) and counsel for the defendant OSCAR BEJARNO HERNANDEZ has made no written presentation. Additional oral presentations were made by the parties in open court on August 11, 1972.

"Under our Constitution, each defendant is entitled to the due process of the law and to a fair trial. The Court has an affirmative duty to do everything possible within its Constitutional powers and jurisdiction to make certain that each defendant does receive a fair trial. In this matter, it appears clear that good cause exists for the making of a Protective Order in the premises.

"In order to fulfill that Constitutional duty to guarantee that the defendants do receive a fair trial, and because of the obvious public interest in this matter which has produced widespread news media publicity, and it further appearing to the Court that the dissemination by any means of public communication of any out-of-court statements relating to this cause may interfere with the Constitutional right of the defendants to a fair trial and disrupt the proper administration of justice, the Court, will now issue the following orders, a violation of which will result in swift action to punish for contempt any offender within the jurisdiction of this Court.

---

*Assigned by the Chairman of the Judicial Council.

"It is the ORDER of this Court that no party to this action, nor any attorney connected with this case as defense counsel or as a prosecutor, nor any other attorney, nor any judicial officer or employee, nor any public official, including but not limited to any chief of police, nor any sheriff, nor any agent, deputy or employee of any such persons, nor any witness having appeared at the preliminary hearing in this matter, nor any person subpoenaed to testify at the trial of this matter, shall release or authorize the release for public dissemination of any purported extrajudicial statement of either of the defendants relating to this case, nor shall any such persons release or authorize the release of any documents, exhibits, or any evidence, the admissibility of which may have to be determined by the Court, nor shall any such person make any statement for public dissemination as to the existence or possible existence of any document, exhibit, or any other evidence, the admissibility of which may have to be determined by the Court. Nor shall any such persons express outside of court an opinion or make any comment for public dissemination as to the weight, value, or effect of any evidence as tending to establish guilt or innocence. Nor shall any such persons make any statement outside of court as to the nature, substance, or effect of any testimony that has been given. Nor shall any such persons issue any statement as to the identity of any prospective witness, or his probable testimony, or the effect thereof. Nor shall any person make any out-of-court statement as to the nature, source, or effect of any purported evidence alleged to have been accumulated as a result of the investigation of this matter. Nor shall any such person or any witness, whether or not under subpoena, make any statement as to the content, nature, substance, or effect of any testimony which may be given in any proceeding related to this matter, except that a witness may discuss any matter with any attorney of record or agent thereof.

"This Order does not include any of the following:

"1. Factual statements of the accused person's name, age, residence, occupation, and family status.

"2. The circumstances of the arrest, namely, the time and place of the arrest, the identity of the arresting and investigating officers and agencies, and the length of the investigation.

"3. The nature, substance, and text of the charge, including a brief description of the offenses charged.

"4. Quotations from, or any reference without comment to, public records of the Court in the case, or to other public records or communications heretofore disseminated to the public.

"5. The scheduling and result of any stage of the judicial proceeding held in open court in an open or public session.

"6. A request for assistance in obtaining evidence.

"7. Any information as to any person not in custody who is sought as a possible suspect or witness, nor any statement aimed at warning the public of any possible danger as to such person not in custody.

"8. A request for assistance in the obtaining of evidence or the names of possible witnesses.

"This Order is not intended to preclude any witness from discussing any matter in connection with the case with any of the attorneys representing the defendants or the People, or any representative of such attorneys.

"It being the further opinion of this Court that Constitutional protections are of little value if the news disseminating agencies seek, investigate, editorialize, and disseminate information of the foregoing proscribed character with respect to this cause, giving anonymity and asserting protection as to their source of information; *it is therefore now* ORDERED *that all agencies of the public media, including written publications, radio, and television, their respective reporters, editors, publishers, and other agents, refrain from the publication of any matters with respect to the present cause*

*except as occur in open court, and particularly as proscribed in the preceding paragraphs of this Order.*

"It is further ORDERED that a copy of this Order be attached to any subpoena served on any witness in this matter, and that the return of service of the subpoena shall also include the fact of service of a copy of this Order. The public media shall consider themselves bound upon release of this present Order.

"This Order shall be in force until this matter has been disposed of or until further Order of Court." (Italics added.)

## APPENDIX B

### [Findings of August 24, 1972.]

"The appellate cases seem in some conflict as to whether findings with respect to the trial court's order regarding publicity made on August 11, 1972, are required (not required, *Hamilton* v. *Municipal Court,* 270 C.A. (2d) 797; perhaps required, *Chase* v. *Robson,* 435 F. (2d) 1059). Accordingly, in the event such findings are appropriate, the court makes the specific findings implicit in the subject order referred to and upon the evidence and judicial notice before the trial court on August 11, 1972.

"I. That since the date of the alleged incident on July 2, 1972, involving the within defendants, widespread publicity and news media coverage has been uttered with respect to the matter. This material has been carried on television, radio, and in written publcations, and has included speculations with respect to the guilt of the defendants.

"II. That on the first occasion when the defendants appeared for arraignment in this Court, to wit, on August 2, 1972, oral motion was made on behalf of the defendant DONALD PAUL ANTELO for a protective order with respect to pre-trial publicity, to apply not only to principals and representatives in these proceedings, but to the news reporting and disseminating media.

"III. That since the date of July 2, 1972, tension and a highly charged atmosphere has existed with reference to the present case, which if fanned by the circumstances set out in preceding Finding I, would constitute a clear and present danger to the administration of justice.

"IV. That a reasonable likelihood existed on August 11, 1972, that a denial of a fair trial would occur unless the trial court intervened with a protective order regarding publicity of the character made in the premises. That such order was required to insure a reasonable decorum and to preserve a fair trial.

"V. That with the modern means of rapid news communication, the traditional remedy of venue change is of minor significance, at least if unaccompanied by a protective order regarding publicity of the character issued in the premises.

"VI. That First Amendment rights with respect to freedom of expression are of primary importance in our culture, but must be balanced with Sixth Amendment rights with respect to fair trial and the Constitutional concepts of equal protection of the laws. That all of such Constitutional rights have equal dignity, and cannot be ranked in an order of preference. That a protective order regarding publicity of the character made by the trial court herein on August 11, 1972, is essential to the interoperation of Constitutional rights and to preserve a line between freedom and license."