[Civ. No. 50399. Second Dist., Div. Two. Mar. 3, 1977.]

Estate of WILLIAM RANDOLPH HEARST, Deceased.
TRUSTEES OF THE WILLIAM RANDOLPH HEARST
TESTAMENTARY TRUST, Petitioners and Appellants, v.
LELAND LUBINSKI et al., Objectors and Respondents.

[Civ. No. 49842. Second Dist., Div. Two. Mar. 3, 1977.]

LELAND LUBINSKI et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
TRUSTEES OF THE WILLIAM RANDOLPH HEARST
TESTAMENTARY TRUST, Real Parties in Interest.

**COUNSEL**

Flint & Mackay, Philip M. Battaglia, Richard I. Gilchrist and William S. Walter for Petitioners and Appellants and for Real Parties in Interest.

Gary D. Sowards, Fred Okrand, Jill Jakes, Mark D. Rosenbaum and Terry Imerling for Objectors and Respondents and for Petitioners.

No appearance for Respondent.

**OPINION**

**FLEMING, J.**—Trustees under the will of William Randolph Hearst (Trustees) secured orders from the probate court on 26 March 1974 and 5 June 1975 cutting off public access to and sealing the probate files in Estate of Hearst. Thereafter, on 21 July 1976, on Trustees' further petition to seal the files the court declared it had "no authority to seal a Probate file and bar the public access thereto absent a statute granting such power" and entered an order vacating its prior orders. The court then stayed its vacation order to allow Trustees to take an appeal, which they have done.[1] Two members of the press (Newsmen) who opposed Trustees' petition below sought mandamus from this court to annul the probate court's stay and thereby open the probate file in Estate of Hearst to public inspection. We continued the stay to prevent the appeal from becoming moot, and we accelerated briefing of the appeal in order to resolve the issue expeditiously.

In view of the issuance of our own stay to allow effective appellate review, we deny the petition for mandate.

[1]Trustees also appeal the court's later order of 4 August 1976, which approved a special procedure for viewing Estate of Hearst files whereby the public would have unlimited access thereto upon production of "proper identification."

■ On the appeal, we note that the order appealed from represents an exercise of the court's continuing probate jurisdiction over the testamentary trust of William Randolph Hearst. As such the order is not properly appealable (Prob. Code, § 1240) but is reviewable on certiorari. (*Fredrickson* v. *Superior Court* (1952) 38 Cal.2d 593, 597 [241 P.2d 541]; *Lilienkamp* v. *Superior Court* (1939) 14 Cal.2d 293, 303-304 [93 P.2d 1008].) We also note that the principal reason for limiting appeals in probate matters is to prevent delay in the distribution of estates (*Conservatorship of Smith* (1970) 9 Cal.App.3d 324, 327 [88 Cal.Rptr. 119]), a factor not relevant to the controversy here. We therefore treat Trustees' appeal as an application for writ of certiorari to review the instant proceedings, and we grant the writ because it involves a question of public importance appropriate for resolution. (Cf. *State Board of Equalization* v. *Superior Court* (1935) 5 Cal.App.2d 374, 378 [42 P.2d 1076]; *People* v. *Superior Court* (1947) 29 Cal.2d 754, 756 [178 P.2d 1, 40 A.L.R.2d 919].)

The gravamen of Trustees' petition asking the probate court to seal the files and will in Estate of Hearst was that members of the Hearst family, including minors and family members who have changed their surname by marriage, would be in grave danger of their lives and property if their identities were discovered through use of the probate files in Estate of Hearst, files which contain periodic accountings and pertinent material dealing with the testamentary trust from the time of Hearst's death to the present. As evidence of such imminent danger Trustees filed newspaper clippings reporting numerous bombings, threats to the lives of family members, and events related to the notorious kidnaping of Patricia Hearst. Most of these events occurred in early 1976 and suggested that the Hearst family had become a target for various lawless radical organizations. Although the whereabouts and identities of prominent members of the Hearst family and their properties were admittedly public knowledge, Trustees asserted that use of the material in the probate files would expose many hitherto unnoticed persons as members of the family and reveal the location of their homes and properties, this because periodic accountings filed on behalf of the trust identified the beneficiaries and their home addresses. Further, the accountings would pinpoint property holdings of the Hearst trust which, to date, have not been publicly identified. Trustees asked the court to exercise its inherent jurisdiction to control its records by sealing the files in the Hearst estate until such time as threats to members of the family had dissipated and danger to their lives and property had ended.

Challenging this right, Newsmen assert that the probate files of the superior court are public records, and that to exclude reporters from viewing them would constitute a prior restraint on their First Amendment right to gather and publish information in the public domain. They rely on the so-called "gag order" cases such as *Nebraska Press Assoc.* v. *Stuart* (1976) 427 U.S. 539 [49 L.Ed.2d 683, 96 S.Ct. 2791], and *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029], holding that the party seeking to prevent publication of truthful newsmedia presentations carries a heavy burden to justify prior restraint on privileged First Amendment communication and commentary. They point to cases establishing the right of reporters to be present at court trials absent compelling reasons for their exclusion, and cite *State* ex rel. *Gore Newspaper Co.* v. *Tyson* (Fla.App. 1975) 313 So.2d 777, wherein the appellate court restrained a trial judge from conducting a marital dissolution proceeding in a closed courtroom, even though both parties had requested exclusion of the press. The court there stated that court proceedings are to be conducted "in the sunshine," that a court may not enshroud its proceedings in secrecy "solely to accommodate litigants." (P. 787.)

Although the California Public Records Act (Gov. Code, §§ 6250*ff.*) does not apply to court records (see § 6252, subd. (a)), there can be no doubt that court records are public records,[2] available to the public in general, including news reporters, unless a specific exception makes specific records nonpublic. (See *Craemer* v. *Superior Court* (1968) 265 Cal.App.2d 216, 220-222 [71 Cal.Rptr. 193].) To prevent secrecy in public affairs public policy makes public records and documents available for public inspection by newsmen and members of the general public alike. (*Craemer, supra,* at p. 222; *Bruce* v. *Gregory* (1967) 65

[2]Government Code section 6260 provides that the Public Records Act shall not affect the status of judicial records as it existed immediately prior to the effective date of the Public Records Act, thus evincing legislative intent to continue prior law. Public status of court records was established by former sections of the Code of Civil Procedure 1892, 1894, and 1888, and by present section 1904. California courts have consistently classified judicial records as public writings. (*Hibernia Savings and Loan Society* v. *Boyd,* 155 Cal. 193 [100 P. 239].) The Attorney General has expressed the opinion that wills delivered to the county clerk for safekeeping (Prob. Code, § 320) are public records, and that the clerk must provide certified copies to the public on proper demand. (10 Ops.Cal.Atty. Gen. 111.) Public status of court records can also be inferred from the language of Government Code section 69503, which, in authorizing the destruction of superior court records, requires that "(c) The county clerk shall maintain for the use of the public a microphotographic film print or copy of each *will*, document, *record*, instrument, book, deposition, transcript, or other paper so destroyed . . ." (Italics added.) Judicial *record* is defined in Code of Civil Procedure section 1904 as the record or official entry of the proceedings in a court of justice or the official act of a judicial officer.

Cal.2d 666, 677 [56 Cal.Rptr. 265, 423 P.2d 193].) Statutory exceptions exist (see e.g., exemptions under Gov. Code, § 6254; see also list of statutory exceptions in *Craemer, supra,* at pp. 220-221, fn. 4), as do judicially created exceptions, generally temporary in nature, exemplified by such cases as *Craemer, supra,* and *Rosato* v. *Superior Court* (1975) 51 Cal.App.3d 190 [124 Cal.Rptr. 427], which involved temporary sealing of grand jury transcripts during criminal trials to protect defendant's right to a fair trial free from adverse advance publicity. Clearly, a court has inherent power to control its own records to protect rights of litigants before it, but "where there is no contrary statute or countervailing public policy, the right to inspect public records must be freely allowed." (*Craemer, supra,* 265 Cal.App.2d at p. 222.) The court in *Craemer* suggested that countervailing public policy might come into play as a result of events that tend to undermine individual security, personal liberty, or private property, or that injure the public or the public good.

■ The sealing orders under scrutiny here do not operate as prior restraint on the press, as did the "gag orders" discussed in the United States Supreme Court cases, cited *supra,* and in such California cases as *Sun Co. of San Bernardino* v. *Superior Court* (1973) 29 Cal.App.3d 815 [105 Cal.Rptr. 873], and *Younger* v. *Smith* (*Times Mirror Co.* v. *Superior Court*) (1973) 30 Cal.App.3d 138 [106 Cal.Rptr. 225].) Rather, "neither the press nor the petitioners were named in the protective or seal orders, . . . they were not subject to their terms, and . . . those orders did not purport to operate as a direct restraint on newspersons from publishing any information . . ." (*Rosato* v. *Superior Court, supra,* 51 Cal.App.3d at p. 207.) Accordingly, the so-called "clear and present danger test" does not apply, and the issue is the reasonableness of the trial court's sealing and unsealing orders under the circumstances of the case. (See *Rosato, supra,* 51 Cal.App.3d at p. 208; *Craemer, supra,* 265 Cal.App.2d at pp. 225-226.)

■ In considering reasonableness of the various orders of the court, we point out, first, that no statute exempts probate files from the status of public records, and that when individuals employ the public powers of state courts to accomplish private ends, such as the establishment and supervision of long-term testamentary trusts, they do so in full knowledge of the possibly disadvantageous circumstance that the documents and records filed in the trust will be open to public inspection. To some extent they can protect against the disadvantage of publicity by arranging for the service of papers on individual beneficiaries through their attorneys or through post-office-box addresses. Alternatively, they can

eschew court-regulated devices for transmission of inherited wealth and rely on private arrangements such as *inter vivos* gifts, joint tenancies, and so-called "living" or grantor trusts. But when the parties perceive advantages in obtaining continuing court supervision over their affairs, thereby projecting their wishes beyond the span of their individual lives and securing court protection for the beneficiaries of their testamentary plans, in a sense they take the good with the bad, knowing that with public protection comes public knowledge of the activities, assets, and beneficiaries of the trust.

What is more, the public has a legitimate interest in access to public records, such as court documents, which establish and perpetuate long-term testamentary trusts. If public court business is conducted in private, it becomes impossible to expose corruption, incompetence, inefficiency, prejudice, and favoritism. For this reason traditional Anglo-American jurisprudence distrusts secrecy in judicial proceedings and favors a policy of maximum public access to proceedings and records of judicial tribunals. Thus in *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 350 [16 L.Ed.2d 600, 613, 86 S.Ct. 1507], the court said it is a vital function of the press to subject the judicial process to "extensive public scrutiny and criticism." And the California Supreme Court has said, "it is a first principle that the people have the right to know what is done in their courts." (*In re Shortridge* (1893) 99 Cal. 526, 530 [34 P. 227].) Absent strong countervailing reasons, the public has a legitimate interest and right of general access to court records, one of special importance when probate involves a large estate with on-going long-term trusts which reputedly administer and control a major publishing empire.

On the other hand, the circumstances at bench are highly unusual; not every wealthy family becomes the unfortunate target of a series of terrorist attacks. If indeed it were established that beneficiaries of the Hearst trusts would be placed in serious danger of loss of life or property as a consequence of general public access to the Hearst probate files, then the court would have the power to protect the beneficiaries' interests by temporarily denying public access to those files, in that protection of beneficiaries is one of the justifications for court jurisdiction over a testamentary trust. Close and difficult factual questions may be involved in balancing the right of public access to public records against rights of the Hearst beneficiaries to be secure from possible terrorist attacks. The court below did not address these questions, for when it vacated its prior orders sealing the files, it did so under the misapprehension it had no power to deny public access to probate files. The court

acted under a misconception of its authority, for it does possess limited power, exercisable under exceptional circumstances and on a showing of good cause, to restrict public access to portions of court records on a temporary basis. ▮ ▮▮▮ Cases such as *Craemer* and *Rosato,* establish that on a sufficiently strong showing of necessity, the court has a right to limit access to its records for temporary periods.[3] When, as here, relief sought extends to sealing of permanent court records and denial of access to court orders, rather than temporary limitation of access to evidentiary transcripts, the trial court must be careful to limit its denial of access by narrow and well-defined orders. For example, in *Craemer* (which did not involve permanent court records but transcripts of grand jury proceedings), the court suggested a procedure whereby an indicted defendant would be given a reasonable opportunity to examine his grand jury transcript and request that designated portions be withheld from public scrutiny during his trial, with the remainder of the transcript becoming accessible to public inspection. At bench Trustees are entitled to a fair chance to demonstrate to the tribunal having custody of the records the existence of compelling reasons to seal portions of the file in Estate of Hearst. A sensible solution might temporarily seal portions of the Hearst files containing such material as current names and addresses of little-known beneficiaries and the location of tangible trust properties vulnerable to attack. Such material should be withheld from public access only on a temporary basis, with the continuing burden resting on Trustees to periodically show that the Hearst family continued under clear and present danger of attack. Alternatively, the court, after reconsidering its decision in light of the principles herein expressed, may choose not to deny access to any portion of the files, in the belief that normal access to the files will not seriously endanger the lives or property of trust beneficiaries.

In reference to the court's order of 4 August 1976 providing limited access to the Hearst file upon production of "proper identification," we note that this order not only lacks standards for enforcement, but is invalid to the extent it purports to grant the press greater rights of access to Estate of Hearst files than to the public generally. ▮ At issue here are rights of public access to public court records and in this respect members of the press have no greater rights or privileges than do members of the general public. (See *Kirstowsky* v. *Superior Court* (1956)

[3]For the guidance of the trial court we point out that Trustees' argument as to their absolute right of privacy in these files has no weight. As previously noted, court records are public records, and the burden rests on Trustees to show compelling reasons why and to what extent these records should temporarily be made private.

143 Cal.App.2d 745, 754-755 [300 P.2d 163]; *Craemer* v. *Superior Court, supra,* 265 Cal.App.2d 216, 2l9; *Los Angeles Free Press, Inc.* v. *City of Los Angeles* (1970) 9 Cal.App.3d 448, 455 [88 Cal.Rptr. 605]; see also *Zemel* v. *Rusk* (1965) 381 U.S. 1, 16-17 [14 L.Ed.2d 179, 189-190, 85 S.Ct. 1271].) The key factor here is the public nature of records, not freedom of the press, and not prior restraint of the press. In *Kirstowsky, supra,* the court said, "If the court had the right to exclude the public during the time defendant was upon the witness stand it had the right also to exclude the members of the press. The freedom of the press is in no way involved in this proceeding." (143 Cal.App.2d at pp. 754-755.) ██ As was said in *Zemel* v. *Rusk, supra,* "The right to speak and publish does not carry with it the unrestrained right to gather information." (381 U.S. at p. 17 [14 L.Ed.2d at p. 190].)

The petition for mandate is denied. The appeal is treated as review under certiorari, the orders of 21 July 1976 and 4 August 1976 are annulled, and the cause is remanded for further proceedings in harmony with this opinion. Each party to bear their own costs.

Roth, P. J., and Beach, J., concurred.

A petition for a rehearing was denied March 29, 1977, and the petition of objectors and respondents and petitioners for a hearing by the Supreme Court was denied April 28, 1977. Mosk, J., and Manuel, J., were of the opinion that the petition should be granted.