[No. A039803. First Dist., Div. Three. May 27, 1988.]

JAN CHAMPION et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
JAMES F. BOCCARDO et al., Real Parties in Interest.

**COUNSEL**

Townsend & Townsend, Paul W. Vapnek and Kenneth A. Weber for Petitioners.

Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Robert F. Kane, Ted F. Hannig, James F. Sweeney, Pillsbury, Madison & Sutro, Walter R. Allan, David S. Winton, Iwasaki, Thomas & Sheffield, Hardy L. Thomas, Steinhart & Falconer and David E. Lombardi as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Richard M. Bryan, Kathleen A. Foley, Nelson H. Wild, Morrison & Foerster, James J. Brosnahan and Edward J. Niland for Real Parties in Interest.

## OPINION

**WHITE, P. J.**—This petition invites us to examine the intricate web woven by a legal partnership specializing in personal injury litigation. A former partner asks us to (1) find that the partnership's agreement for sharing fees for unfinished cases taken by a departing partner violates several rules of professional conduct, and (2) declare that he is entitled to share in the profits of the partnership from all cases pending at the time of his departure. Other former partners and a former client appear as amici curiae in support of the petition. We examine the web because it reaches far into the community, entangling other former partners and former clients. We conclude that because of rule 2-107 of the Rules of Professional Conduct of the State Bar of California and because of public policy, the partnership agreement may not be enforced. We conclude, however, that petitioner is not entitled to share the fees from all cases pending at the time of his departure. In the second part of our opinion, we consider requests to seal the record of this proceeding. We explain the procedures to be used in appellate courts when seeking to file or lodge confidential documents.

In March of 1985, the Boccardo Law Firm amended its partnership agreement to change the way pending cases were treated upon termination or withdrawal of a partner. Whereas former section 9.9 presented different formulae for sharing client fees between the partnership and the departing partner, depending upon the progress of the cases, new section 9.9 established a uniform rule. It provided that "in the event of termination or withdrawal all clients and client files remain the property of the Partnership *and in the event that a client desires to have the withdrawing partner as his, her, or its attorney, he, she or it may do so but any fees realized in any such case shall remain the property and asset of the Partnership. The withdrawing partner shall be entitled to receive that percentage of the fees equal to his percentage in the Partnership at the time of his departure.* The Firm shall have a lien on the case and its proceeds to protect and secure the Partnership's interest in such case or cases."

At the time of the amendment some 15 attorneys were members of the Boccardo Law Firm. James F. Boccardo held a 51 percent interest in the firm and the other partners held interests ranging from 2.8 percent to 5.4 percent. Petitioner, a five-year associate of the firm, joined the firm, taking a 1.0 percent interest and signing an agreement to be bound by the terms of the partnership agreement and all amendments thereto. (In this opinion, we use the term "petitioner" to refer to Jan Champion and Jan Champion, a professional law corporation.) For reasons not pertinent here, petitioner resigned on June 30, 1986, holding a 1.79 percent interest in the firm. At

least eight former clients of the Boccardo Law Firm elected to be represented by petitioner after his departure.

Shortly after petitioner's departure, the Boccardo Law Firm and its remaining partners, real parties in interest here, filed an action against petitioner and others seeking, inter alia, a declaration of rights and duties of the partners under the agreement. Petitioner answered and cross-complained, asserting a different interpretation of the partnership agreement. Both petitioner and real parties moved for summary adjudication, seeking to establish and enforce their differing interpretations of section 9.9 of the partnership agreement. After briefing and argument, the court ruled in real parties' favor. This petition followed.

After the petition was filed we were deluged with requests to seal parts of the record. We also received two applications to appear as amici curiae. We granted the requests of amici curiae, and at first we granted some requests to seal documents. But more requests to seal were filed and briefs arrived addressing public and sealed information without distinction, often *assuming* confidential treatment without specifically requesting it. It became increasingly apparent that the situation called for a more deliberate approach to the question of sealing documents. We deferred ruling on other requests for sealing, but held the documents in confidence while we considered the requests. We are now prepared to rule on both the petition and the requests to seal documents. We address the merits of the petition first.

### The Merits of the Petition

Petitioner takes the position that new section 9.9 of the partnership agreement is ambiguous and may be interpreted to call for sharing between former partners and the partnership of fees from all pending cases of the firm, not just cases taken by the departing partner. Petitioner contends that if the section is not so interpreted it violates several rules of professional conduct. Petitioner asserts that the court erred in interpreting the section to cover only fees from cases taken by petitioner and in ruling that the section so interpreted was enforceable.

In order to demonstrate conflict with rules of professional conduct, petitioner presents the example of a partnership client who chose to retain him after his departure from the partnership. Petitioner points out that since his departure he has taken several depositions in her case and plans to conduct further discovery, and that he expects to conduct a two-week trial in the case. But if the jury returns a verdict of $160,000, petitioner will receive a fee of only $912, while the partnership will receive $50,088. Petitioner contends that this arrangement: (1) provides an unconscionable fee to the

Boccardo Law Firm in violation of rule 2-107 of the Rules of Professional Conduct, (2) constitutes unlawful fee splitting without the consent of the client, in violation of rule 2-108 of the Rules of Professional Conduct, and (3) unlawfully restricts him in the practice of law, in violation of rule 2-109 of the Rules of Professional Conduct. He also argues that enforcement of the provision as interpreted by the court violates public policy by infringing upon his client's right to representation by the attorney of her choice. Because of the economics of law practice, he will be unable to represent this client (and others) if the court's application of section 9.9 is upheld.

Our reading of section 9.9 fails to uncover the ambiguity to which petitioner refers. The section states that "all clients and client files" remain the property of the partnership and that if a client desires to hire the withdrawing party, "any fees realized in any such case shall remain the property and asset of the Partnership," subject to the withdrawing partner's right to receive his partnership percentage of the fees. Under section 9.9, fees to be shared are the fees of "any such case," which refers to the case of a client who desires to hire the withdrawing partner, not to the cases of all clients of the firm, as urged by petitioner.

Petitioner argues violation of several rules of professional conduct. We examine only one, because we find it, and considerations of public policy, dispositive. ■■■ We conclude, as a matter of law, that the agreement here provides an unconscionable fee to the Boccardo Law Firm, in violation of rule 2-107 of the Rules of Professional Conduct.

Rule 2-107 provides in part: "(A) A member of the State Bar shall not enter into an agreement for, charge or collect an illegal or unconscionable fee. (B) A fee is unconscionable when it is so exorbitant and wholly disproportionate to the services performed as to shock the conscience of lawyers of ordinary prudence practicing in the same community. . . ." Petitioner contends that if his clients are required to turn over to the Boccardo Law Firm most of the legal fees for pending cases formerly with the partnership, the partnership will be exacting an unconscionable fee within the meaning of rule 2-107. We agree.

We do not doubt the Boccardo Law Firm's assertion that it provides each client a significant service when it signs an agreement with him or her and dedicates its reputation to his or her service and its considerable resources to preparation of the client's case. But paragraph 9.9 provides, in essence, that for the very act of signing the agreement, the Boccardo Law Firm is entitled to receive almost all the legal fees recovered, regardless of how much of the case preparation is performed by the Boccardo Law Firm.

The agreement is quite specific "all clients and client files remain the property of the Partnership." Even if a client retains a departing partner, "any fees realized in any such case shall remain the *property* and *asset* of the Partnership." (Italics added.) These fees have no relationship whatsoever to the amount of service provided or to be provided by the partnership to the client. No consideration is given to the stage of litigation at the time of departure. An agreement to share the fees in unfinished cases is not per se unconscionable. But the way in which this agreement shares the fees is unconscionable. A fee of this size, without any relationship to services rendered, must "shock the conscience of lawyers of ordinary prudence practicing" in the community.

Under other circumstances we would be reluctant to interfere with enforcement of an agreement entered between or among attorneys governing their partnership relations. If a partnership agreement appears unfair to one or more of several partners, the unfairness probably reflects the relative strengths of the partners and their shares in the partnership. We would be reluctant to take any step which might increase or diminish the strength of any partner. In this case, however, our reluctance is overcome by public policy, which urges us to protect the interests of the partnership's former clients.

██ "It has long been recognized in this state that the client's power to discharge an attorney, with or without cause, is absolute (Code Civ. Proc., § 284)." (*Fracasse* v. *Brent* (1972) 6 Cal.3d 784, 790 [100 Cal.Rptr. 385, 494 P.2d 9].) Closely related is the client's right to retain counsel of choice. (See *Estate of Cazaurang* (1934) 1 Cal.2d 712, 713-714 [36 P.2d 1069].) Paragraph 9.9 purports to permit a client to elect representation by a withdrawing partner, but in most cases it denies the client such representation by denying the withdrawing partner reasonable compensation for representation. An attorney not formerly a partner may take the client's case encumbered only by the obligation to reimburse the Boccardo Law Firm in quantum meruit in case of a recovery. (*Fracasse* v. *Brent, supra,* 6 Cal.3d at pp. 791-793.) By contrast, petitioner or another former partner could take the case only as a partially paid volunteer unless the amount of remaining work were small. Thus, as a practical matter, the client is deprived of representation by the very lawyer most familiar with the case and most desired by the client.

Real parties contend that this burden on the client is not too great. They say that a client has no reasonable expectation that an attorney leaving the law partnership will be able to continue to represent the client because the attorney might go to work for government or a corporation or might switch to another kind of business. But a sacrifice of the client's interest that might

be acceptable to permit an individual attorney to change his or her career is not acceptable where motivated only by a partnership's desire to protect its expected profits. When an attorney remains willing and able to represent a client, representation should not be barred by an unconscionable partnership agreement with former partners.

As an additional position, petitioner contends that any determination that the contract is legal and enforceable may be made only by interpreting paragraph 9.9 to require sharing fees in all pending partnership cases.

Petitioner's proposal is patterned after the decisions in *Jewel* v. *Boxer* (1984) 156 Cal.App.3d 171 [203 Cal.Rptr. 13], and *Fox* v. *Abrams* (1985) 163 Cal.App.3d 610 [210 Cal.Rptr. 260]. In *Jewel* v. *Boxer,* a four-member partnership split into two 2-member partnerships, each taking some of the clients of the former partnership. The partnership had no agreement to cover dissolution. The trial court sought to apply a formula based upon quantum meruit principles to allocation of the fees for the pending cases. But the appellate court rejected this approach. It applied a principle of partnership law that, absent an agreement to the contrary, no partner is entitled to extra compensation for services rendered in completing unfinished business of the partnership: "the former partners will receive, in addition to their partnership portion of such income, their partnership share of income generated by the work of the other former partners, without performing any postdissolution work in those cases. On balance, the allocation of fees according to each partner's interest in the former partnership should not work an undue hardship as to any partner where each partner completes work on the partnership's cases which are active upon its dissolution." (*Jewel, supra,* 156 Cal.App.3d at p. 179.) The court noted two basic fiduciary obligations of former partners, the duty to wind up and complete the unfinished business of the dissolved partnership, and the principle that no former partner may take any action with respect to unfinished business which leads to purely personal gain. (*Ibid.*) ██ Under these principles the former partners are obligated to ensure that a disproportionate burden of completing unfinished business does not fall on one former partner or one group of former partners. (*Ibid.*)

*Fox* v. *Abrams, supra,* 163 Cal.App.3d 610, followed *Jewel* v. *Boxer,* applying it to the dissolution of a law corporation where the shareholders' agreement did not adequately set forth the rights of the remaining shareholders against departing shareholders.

We agree that reading paragraph 9.9 to require *Jewel* v. *Boxer* sharing of all the fees for unfinished partnership cases might avoid the illegality. However, such a reading would torture the language of paragraph 9.9 and create

a de facto dissolution. It would impose upon petitioner the burden of performing his share of the work in winding up unfinished partnership cases.

■ Another, less drastic, approach is available. If paragraph 9.9 is declared unenforceable, the natural result is that a withdrawing partner may represent a former client under the same terms as would an attorney who had never been a partner, controlled only by the quantum meruit requirement of *Fracasse* v. *Brent, supra,* 6 Cal.3d 784, for reimbursing the partnership for its contribution to the case. In the case of a partner who leaves with less than his or her share of the lucrative cases, this approach is better for the partnership than a dissolution and still protects the client's interest. In the case of a partner who takes more than his or her share of the lucrative cases, the partnership is not powerless to secure a more favorable result. It may elect to dissolve under paragraph 10 of the partnership agreement and wind up its financial affairs under the principles of *Fox* v. *Abrams* and *Jewel* v. *Boxer*. Thus, the partnership controls the decision whether to permit the withdrawing partner to represent the clients as would a stranger to the partnership or to wind up the partnership with a sharing of the fees and of the work on the unfinished cases.

We conclude that paragraph 9.9 does not permit a sharing of fees in all pending partnership cases upon withdrawal of a partner. ■ However, paragraph 9.9 may not be enforced against a departing partner, who may represent a former client under the same terms as would a stranger to the partnership. Only by dissolving the partnership may a *Jewel* v. *Boxer* sharing of the fees and of the work of winding up be required. The trial court erred in ruling that paragraph 9.9 was enforceable.

### Requests to Seal the File

We turn now to the question of sealing documents furnished by the parties and by amici curiae. It is with some trepidation that we tread in this area where customs and practices vary greatly and little written guidance exists. But tread we must, as we have seen a recent acceleration in requests to seal documents of this court and an increasing trend by litigants to assume that when the parties stipulate below or convince the trial court of the need for confidentiality, no showing of need must be made in this court.

In order to place the question of sealing documents in context, we will trace the progress of this petition and its related documents and of the various requests for sealing. First the petition was filed openly in this court. Soon afterwards petitioner lodged a set of 19 exhibits. A cover letter advised this court that although petitioner did not view the exhibits as sensitive, the trial court had ordered the file sealed and other parties might consider the

records sensitive. Petitioner then followed up with an application for an order sealing the exhibits, advising this court that real parties did consider some of the documents sensitive. Real parties sent letters confirming that fact. None of the parties explained why the documents were sensitive, but real parties said they contained "information of a highly confidential nature which is the subject of confidential settlement agreements."

Next we received real parties' opposition, along with a request that it be sealed. We also received two amici curiae requests, one accompanied by a request to seal appendices to the amicus brief. These requests too merely asserted confidentiality, without explaining the need. We granted the requests to seal, influenced by the parties' agreement to the procedure and by the lower court's sealing of its records.

Afterwards rebuttal briefs, rebuttal declarations, reply to amici, declarations in reply to amici, and supplemental declarations were received. The authors of these documents apparently assumed that the entire file was sealed, for they often failed to request sealing even when they were responding to sealed documents. Finally, both petitioner and real parties, apparently in a quandary similar to ours, filed applications for orders sealing all briefs, petitions, applications, and all other pleadings filed in this case.

At the time of this opinion, our file contains some sealed documents, some public documents, and many documents not yet designated as sealed or public. Most documents blend together discussions of confidential and public materials. Requests to seal all the documents are pending. Nowhere in any of the requests do we find an explanation of why anything provided to us deserves such treatment.

We find no guidance in the California Rules of Court. However, recent case authority addressing trial court confidentiality orders informs us of procedures and principles which may be adapted for appellate courts. In *Estate of Hearst* (1977) 67 Cal.App.3d 777 [136 Cal.Rptr. 821], the court squarely faced the question of whether a lower court could seal its files from public scrutiny. After first granting a request by trustees of the estate of William Randolph Hearst to seal the probate file, the trial court later denied a similar request, finding no authority to grant the request. The appellate court granted a writ of certiorari to review the trial court decision. On review, the court concluded that "[t]o prevent secrecy in public affairs public policy makes public records and documents available for public inspection by newsmen and members of the general public alike. [Citations.] Statutory exceptions exist [citations], as do judicially created exceptions, generally temporary in nature . . . Clearly a court has inherent power to control its own records to protect rights of litigants before it, but 'where

there is no contrary statute or countervailing public policy, the right to inspect public records must be freely allowed.' [Citation.] . . . [C]ountervailing public policy might come into play as a result of events that tend to undermine individual security, personal liberty, or private property, or that injure the public or the public good." (*Id.*, at pp. 782-783).

In *Hearst,* the trustees had sought to seal the probate file to reduce the danger to family members from discovery of their identities, addresses and property holdings. The trustees' request was made a short time after the notorious kidnapping of Patricia Hearst, and the trustees feared that other members of the family were endangered. The *Hearst* court concluded that if the danger were established, "the court would have the power to protect the beneficiaries' interests by temporarily denying public access to those files," but it observed as well that "[c]lose and difficult factual questions may be involved in balancing the right of public access to public records against rights of the Hearst beneficiaries to be secure from possible terrorist attacks" (*id.,* at p. 784) and that the court possessed "limited power, exercisable under exceptional circumstances and on a showing of good cause, to restrict public access to portions of court records on a temporary basis." (*Id.,* at p. 785.) The court also noted that when "relief sought extends to sealing of permanent court records and denial of access to court orders, rather than temporary limitation of access to evidentiary transcripts, the trial court must be careful to limit its denial of access by narrow and well-defined orders." (*Ibid.*)

Bearing these considerations in mind, it is apparent that we acted precipitously in granting the earliest, unsupported, requests to seal documents lodged or filed in this matter. The decision in *Mary R.* v. *B. & R. Corp.* (1983) 149 Cal.App.3d 308 [196 Cal.Rptr. 871], reminds us that, however appealing it may be to merely accept a stipulation by the parties to seal a record, the temptation must be resisted. In *Mary R.,* a marriage and family counselor had complained to the division of medical quality assurance (the Division) about a physician who molested a 14-year-old patient. In conducting its investigation, the Division was blocked by the victim's assertion that she could not discuss the matter because of a stipulated gag order entered in connection with settlement and dismissal of a civil action against the physician. The Division sought, unsuccessfully, to intervene in the civil action and convince the court to set aside its gag order. On appeal, the *Mary R.* court concluded that though the court was not obligated to permit the Division to intervene, the Division had standing to collaterally attack the validity of the gag order and a related order sealing the file.

Addressing the significance of the parties' stipulation to confidentiality, the court stated: "The stipulated order of confidentiality is contrary to

public policy, contrary to the ideal that full and impartial justice shall be secured in every matter and designed to secrete the evidence in the case from the very public agency charged with the responsibility of policing the medical profession. We believe it clearly improper, even on stipulation of the parties, for the court to issue an order designed not to preserve the integrity and efficiency of the administration of justice [citation], but to subvert public policy . . . ." (*Id.,* at p. 316.) The court went on to quote from *Estate of Hearst* the principles applicable to sealing court records, and to add that "[s]ince court records are public records, the burden rests on the party seeking to deny public access to those records to establish compelling reasons why and to what extent these records should be made private." (*Id.,* at p. 317.)

■ Applying these principles in the appellate court setting, we conclude that a party seeking to lodge or file a document under seal bears a heavy burden of showing the appellate court that the interest of the party in confidentiality outweighs the public policy in favor of open court records. "The law favors maximum public access to judicial proceedings and court records. [Citations.] Judicial records are historically and presumptively open to the public and there is an important right of access which should not be closed except for compelling countervailing reasons." (*Pantos* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 258, 262-263 [198 Cal.Rptr. 489].)

In an appellate court, procedures for in camera review of documents and for making decisions about sealing documents are ill-defined. The parties are, understandably, tempted to assume that documents will be sealed and, for simplicity, to merge discussion of public information with discussion of information under seal or potentially under seal. This temptation must be resisted. We must be vigilant to ensure that nothing presented to the court is sealed without a strong justification.

To assist us in accomplishing our goal, a party seeking an order to seal documents or portions of documents must segregate the confidential or arguably confidential documents or portions of documents from the public documents or portions, and in the public documents say nothing that discloses the contents of the confidential documents or portions. ■ A request to seal a document must be filed publicly and separately from the object of the request. It must be supported by a factual declaration or affidavit explaining the particular needs of the case. Where the contents of the to-be-sealed document become a focus of the argument for sealing, the request must refer the court to the to-be-sealed document, where the court may review its contents and any content-specific declarations and arguments about sealing it. Public documents that argue the merits of the case

must refer to sealed or to-be-sealed documents without disclosing their contents, and where possible should, at least when referring to to-be-sealed documents, stand on their own, and not depend upon the contents of the to-be-sealed documents. (This will avoid complications if the court declines to seal the documents and permits the proffering party to withdraw them.) Arguments on the merits which cannot be made publicly without disclosing confidential information should be made in separate documents accompanied by requests to seal.

Parties should be advised, however, that, more often than not, they can argue effectively to an appellate court by disclosing only the general nature of the confidential information. Thus, a request to seal must explain why the confidential information needs to be presented to the appellate court.

■ Parties must also be careful not to enter into stipulations in trial courts or to acquiesce to trial court confidentiality requests expecting that the stipulations or rulings will control the filing or lodging of documents in the appellate courts. A document may be necessary to the appellate court's determination of a petition for extraordinary relief. (See *Sherwood* v. *Superior Court* (1979) 24 Cal.3d 183 [154 Cal.Rptr. 917, 593 P.2d 862].) The petitioner, who has the burden of presenting the document, will not be excused from doing so if open filing is prevented by an unjustified stipulation or order entered below and if the appellate court returns the document because petitioner has not shown that it warrants sealing.

Where documents have been sealed by order of the lower court, over a petitioner's objection, the petitioner's obligation to present them to the appellate court does not change. When pertinent to the writ petition, they should be presented separately, labeled as confidential, and accompanied by petitioner's objections. Real party in interest must then move for an order sealing the documents in the appellate court and shoulder the burden of proving the need for sealing.

The parties and amici did not follow our outlined procedures in presenting to-be-sealed materials to this court. In hindsight, it is apparent that we should have directed our clerks to return the documents for segregation into public and confidential portions or should have denied the requests for failure to meet the burden of showing grounds for sealing the documents. However, we have now examined and considered the documents, sealed, unsealed, and to be sealed, and have based our ruling on the merits of the petition upon the various documents. Were we to return them now for subdivision and resubmission, we would throw into confusion the basis for our decision and add undue complication and delay to this matter. We

conclude, therefore, that our most prudent course is to grant the application to seal the entire file of this case.

Our conclusions compel us to take the following actions: (1) Let a peremptory writ of mandate issue, compelling the trial court to vacate its order summarily adjudicating the issue of fees against petitioner and to enter a new order adjudicating that paragraph 9.9 is unenforceable. (2) The applications to seal various documents are granted. The clerk of this court is directed to maintain under seal the entire file, with the exception of the various applications for permission to seal documents. The sealed documents are to be viewed only by the parties and their counsel and by any court reviewing the actions of this court.

Barry-Deal, J., and Merrill, J., concurred.

A petition for a rehearing was denied June 24, 1988, and petitioners' application for review by the Supreme Court was denied September 15, 1988. Panelli, J., did not participate therein.