[Nos. B025920, B038975. Second Dist., Div. Three. July 29, 1991.]

CHURCH OF SCIENTOLOGY OF CALIFORNIA et al., Plaintiffs and Appellants, v.
GERALD ARMSTRONG, Defendant and Respondent.

COUNSEL

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, Eric M. Lieberman, Bowles & Moxon, Timothy Bowles, Kendrick L. Moxon and Michael Lee Hertzberg for Plaintiffs and Appellants.

Gerald Armstrong, in pro. per., Toby L. Plevin, Paul Morantz and Michael L. Walton for Defendant and Respondent.

Lawrence Wollersheim as Amicus Curiae on behalf of Defendant and Respondent.

OPINION

DANIELSON, J.—In consolidated appeals, the Church of Scientology of California (the Church) and Mary Sue Hubbard (hereafter collectively plaintiffs) appeal from an order after appealable judgment unsealing the file in *Church of Scientology of California* v. *Gerald Armstrong* (No. B038975), and from the judgment entered in the case (No. B025920). We vacate the order and affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

In the underlying action, the Church sued Armstrong, a former Church worker, alleging he converted to his own use confidential archive materials and disseminated the same to unauthorized persons, thereby breaching his fiduciary duty to the Church, which sought return of the documents, injunctive relief against further dissemination of the information contained therein, imposition of a constructive trust over the property and any profits Armstrong might realize from his use of the materials, as well as damages. Mary Sue Hubbard (Hubbard), wife of Church founder L. Ron Hubbard, intervened in the action, alleging causes of action for conversion, invasion of privacy, possession of personal property [*sic*], and declaratory and injunctive relief. Armstrong cross-complained, seeking damages for fraud, intentional infliction of emotional distress, libel, breach of contract, and tortious interference with contract.

With respect to the complaint and complaint-in-intervention, the trial court found the Church had made out a prima facie case of conversion, breach of fiduciary duty, and breach of confidence, and that Mary Sue Hubbard had made out a prima facie case of conversion and invasion of privacy. However, the court also determined that Armstrong's conduct was justified, in that he

believed the Church threatened harm to him and his wife, and that he could prevent such harm by taking and keeping the documents.

Following those determinations the court made and entered an order, entitled "Judgment," on August 10, 1984,[1] ordering and adjudging that plaintiffs take nothing by their complaint and complaint-in-intervention, and that defendant Armstrong have and recover his costs and disbursements. Plaintiffs filed notice of appeal from that order.

We dismissed the appeal (No. B005912) because that "judgment" was not a final judgment and was not appealable; Armstrong's cross-complaint had not yet been resolved and further judicial action was essential to the final determination of the rights of the parties. (*Lyon* v. *Goss* (1942) 19 Cal.2d 659, 670 [123 P.2d 11].)

Armstrong's cross-action was then settled and dismissed, the subject documents were ordered returned to the Church, and the record was sealed by Judge Breckenridge pursuant to stipulation of the parties. The dismissal of Armstrong's cross-action was a final determination of the rights of the parties, and constituted a final judgment, permitting appellate review of the court's interlocutory order captioned "judgment" filed August 10, 1984.

Plaintiffs then timely filed a new notice of appeal (No. B025920), from the orders entitled "Order for Return of Exhibits and Sealed Documents" and "Order Dismissing Action With Prejudice," both filed December 11, 1986, and from the "Judgment" filed August 10, 1984, stating that the appeal was "only from so much of those orders and judgment which denied damages to plaintiff and plaintiff-intervenor" on their complaints. We rule that the order dismissing action with prejudice is the appealable judgment in No. B025920.[2]

*The Unsealing Order After Judgment (No. B038975)*

On October 11, 1988, Bent Corydon, who is a party to other litigation against the Church, moved to unseal the record in this case for the purpose of preparing for trial of his cases. He sought only private disclosure. Judge

[1]The "judgment" of August 10, 1984, is not included in the present record on appeal. However, it is included in the petition of plaintiffs and appellants for review by our Supreme Court of our decision (No. B005912) in this case, filed December 18, 1986.

[2]We later granted the motion of appellant Church to deem the record on appeal in No. B005912 to be the record on appeal in No. B025920, which is one of the current consolidated appeals; we also take judicial notice of the entire record in No. B005912. Consequently the reporters' transcript, the appendices of the parties on appeal, and the parties' briefs in No. B005912 are part of the record on appeal in No. B025920. The parties have also filed briefs in No. B025928.

Breckenridge having retired, Corydon's motion was heard by Judge Geernaert, who made an order dated November 9, 1988, which he clarified by another order dated November 30, 1988, which opened the record not only to Corydon but also to the general public, thus vacating the earlier order made by Judge Breckenridge.

On December 19, 1988, plaintiffs filed a timely notice of appeal from those orders made after appealable judgment. That appeal, No. B038975, is the other of the current consolidated appeals.

On December 22, 1988, Division Four of this court issued an order staying Judge Geernaert's orders (1) unsealing the record and (2) denying a motion for reconsideration of the unsealing order, to the extent those orders unsealed the record as to the general public and permitted review by any person other than Corydon and his counsel of record. On December 29, 1988, Division Four modified this stay order by adding to it a protective order prohibiting Corydon and his counsel from disseminating copies of or disclosing the content of any documents found in the file to the public or any third party, except to the extent necessary to litigate the actions to which Corydon and the Church were parties. Corydon and his counsel were also required to make good faith efforts in Corydon's litigation to submit under seal any documents they found in the file of this case.

On this appeal, Corydon argues in favor of the trial court's order unsealing the record, as he wishes to be free of the protective orders contained in the modified stay order issued by Division Four.

*The "Judgment" of August 10, 1984 (No. B025920)*

Armstrong's taking of the documents is undisputed. The evidence relating to his claim of justification, which was found credible by the trial court,[3] established that Armstrong was a dedicated member of the Church for a period of 12 years. For 10 of those years, he was a member of the Sea Organization, an elite group of Scientologists working directly under Church founder L. Ron Hubbard. In 1979, Armstrong became a part of L. Ron Hubbard's "Household Unit" at Gilman Hot Springs, California.

In January 1980, fearing a raid by law enforcement agencies, Hubbard's representatives ordered the shredding of all documents showing that Hubbard controlled Scientology organizations, finances, personnel, or the

---

[3]Plaintiffs' contention that certain testimony was impeached by testimony given in other proceedings subsequent to the judgment herein is, of course, not cognizable on this appeal.

property at Gilman Hot Springs. In a two-week period, approximately one million pages were shredded pursuant to this order.

In the course of the inspection of documents for potential shredding, Armstrong reviewed a box containing Hubbard's early personal letters, diaries, and other writings, which Armstrong preserved.

Thereafter, Armstrong petitioned for permission to conduct research for a planned biography of Hubbard, using his discovery of the boxed materials. Hubbard approved the petition, and Armstrong, who had discovered and preserved approximately 16 more boxes of similar materials, became the senior personal relations officer researcher. He subsequently moved the materials to the Church of Scientology Cedars Complex in Los Angeles.

Hubbard selected one Omar Garrison to write his biography. Armstrong became Garrison's research assistant, copying documents and delivering the copies to him, traveling with him, arranging interviews for him, and generally consulting with him about the project. Armstrong also conducted a genealogical study of Hubbard's family, and organized the materials he had gathered into bound volumes for Garrison's use, retaining a copy for the Church archives. The number of documents obtained by Armstrong ultimately reached 500,000 to 600,000. Within a week after commencing the biography project, Armstrong and Garrison began to note discrepancies between the information set forth in the documents and representations previously made concerning Hubbard. Then Armstrong was summoned to Gilman Hot Springs, where he was ordered to undergo a "security check" consisting of interrogation while connected to a crude lie-detector called an E-meter, to determine what materials he had delivered to Garrison and to meet charges that he was speaking out against Hubbard.

In November 1981, Armstrong wrote a report urging the importance of ensuring the accuracy of all materials published concerning L. Ron Hubbard, and relating examples of factual inaccuracies in previous publications. In December 1981, Armstrong and his wife left the Church, surreptitiously moving their possessions from the Church premises because they knew that persons attempting to leave were locked up, subjected to security checks, and forced to sign promissory notes to the Church, confessions of "blackmailable" material obtained from their personal files, and incriminating documents, and they were afraid that they would be forced to do the same. Before leaving, Armstrong and his wife copied a number of documents which he delivered to Garrison for his work on the Hubbard biography. After leaving, Armstrong cooperated with his successor, assisting him in locating documents and other items.

Commencing in February 1982, the international Church of Scientology issued a series of "suppressive person declares" in effect labelling Armstrong an enemy of the Church and charging that he had taken an unauthorized leave, was spreading destructive rumors about senior Church officials, and secretly planned to leave the Church. These "declares" subjected Armstrong to the "Fair Game Doctrine" of the Church, which permits a suppressive person to be "tricked, sued or lied to or destroyed . . . [or] deprived of property or injured by any means by any Scientologist. . . ."

At around the same time, the Church confiscated photographs of Hubbard and others that Armstrong had arranged to sell to one Virgil Wilhite. When Armstrong met with Church members and demanded the return of the photographs, he was ordered from the Church property and told to get an attorney. Thereafter, he received a letter from Church counsel threatening him with a lawsuit. In early May 1982, he became aware of private investigators watching his house and following him.

These events caused Armstrong to fear that his life and that of his wife were in danger, and that he would be made the target of costly and harassing lawsuits. The author, Garrison, feared that his home would be burglarized by Church personnel seeking to retrieve the documents in his possession.

For these reasons, Armstrong took a number of documents from Garrison and sent them to his attorney.

Following commencement of the instant action, Armstrong was pushed or shoved by one of the Church's investigators. In a later incident his elbow was struck by an investigator's vehicle; still later, the same investigator pulled in front of Armstrong on a freeway and slammed on his brakes. This investigator's vehicle also crossed a lane line as if to push Armstrong off the road. Plaintiffs' position is that the investigators were hired solely for the purpose of regaining the documents taken by Armstrong.

Trial of the complaint and the complaint-in-intervention was by the court sitting without a jury. On August 10, 1984, the court made its order, captioned "Judgment," ordering that plaintiff Church and plaintiff in intervention Hubbard, take nothing by their complaint and complaint-in-intervention and that defendant Armstrong have and recover from each of them his costs and disbursements.

## DISCUSSION

### *The Order Unsealing the Record Must Be Reversed*

■ "Although the California Public Records Act (Gov. Code, §§ 6250 [et seq.]) does not apply to court records (see § 6252, subd. (a)), there can be no doubt that court records are public records, available to the public in general . . . unless a specific exception makes specific records nonpublic. (See *Craemer* v. *Superior Court* (1968) 265 Cal.App.2d 216, 220-222 [71 Cal.Rptr. 193].) To prevent secrecy in public affairs public policy makes public records and documents available for public inspection by . . . members of the general public . . . . [Citations.] Statutory exceptions exist [citations], as do judicially created exceptions, generally temporary in nature, exemplified by such cases as *Craemer, supra,* and *Rosato* v. *Superior Court* (1975) 51 Cal.App.3d 190 [124 Cal.Rptr. 427], which involved temporary sealing of grand jury transcripts during criminal trials to protect defendant's right to a fair trial free from adverse advance publicity. Clearly, a court has inherent power to control its own records to protect rights of litigants before it, but 'where there is no contrary statute or countervailing public policy, the right to inspect public records must be freely allowed.' (*Craemer, supra,* 265 Cal.App.2d at p. 222.) The court in *Craemer* suggested that countervailing public policy might come into play as a result of events that tend to undermine individual security, personal liberty, or private property, or that injure the public or the public good." (*Estate of Hearst* (1977) 67 Cal.App.3d 777, 782-783 [136 Cal.Rptr. 821].)

"If public court business is conducted in private, it becomes impossible to expose corruption, incompetence, inefficiency, prejudice, and favoritism. For this reason traditional Anglo-American jurisprudence distrusts secrecy in judicial proceedings and favors a policy of maximum public access to proceedings and records of judicial tribunals. Thus in *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 350 [16 L.Ed.2d 600, 613, 86 S.Ct. 1507], the court said it is a vital function of the press to subject the judicial process to 'extensive public scrutiny and criticism.' And the California Supreme Court has said, 'it is a first principle that the people have the right to know what is done in their courts. (*In re Shortridge* (1893) 99 Cal. 526, 530 [34 P. 227]) Absent strong countervailing reasons, the public has a legitimate interest and right of general access to court records . . . ." (*Estate of Hearst, supra,* 67 Cal.App.3d at p. 784.)

We are unaware of any showing made before Judge Breckenridge, other than the parties' stipulation, justifying sealing by the trial court of the record in this case. However, inasmuch as the parties agreed to the sealing in December of 1986, and no third party intervened at that time to seek

reconsideration or review of the court's order, the order became final long before Corydon intervened in the action almost two years later.

In *Greene* v. *State Farm Fire & Casualty Co.* (1990) 224 Cal.App.3d 1583 [274 Cal.Rptr. 736], the court stated at page 1588: "The power of one judge to vacate an order duly made by another judge is limited. In *Fallon* v. *Superior Court* (1939) 33 Cal.App.2d 48, 52 [90 P.2d 858] we issued a writ of prohibition restraining a successor law and motion judge from vacating an order of his predecessor, stating, 'Except in the manner prescribed by statute a superior court may not set aside an order regularly made.' In *Sheldon* v *Superior Court* (1941) 42 Cal.App.2d 406, 408 [108 P.2d 945] the Court of Appeal, Second Appellate District annulled the order of one probate judge which vacated the previously made order of another probate judge appointing an administrator, stating 'that a valid order made *ex parte* may be vacated only after a showing of cause for the making of the latter order, that is, that in the making of the original order there was (1) inadvertence, (2) mistake, or (3) fraud.' Even more on point, in *Wyoming Pacific Oil Co.* v. *Preston* (1958) 50 Cal.2d 736, 739 [329 P.2d 489] the California Supreme Court reversed the order of a second judge dismissing an action under former [Code of Civil Procedure] section 581a for failure to make service of process within three years, after a first judge had found as a fact that the affected defendant was concealing himself to avoid service of process, quoting *Sheldon.* [Citation.]" (Fn. omitted.)

In *Greene, supra,* Alameda County Superior Court Judge Donald McCullum issued general order 3.30, in which he found it impracticable, futile, or impossible to bring certain cases, including *Greene,* to trial within the applicable five-year limitation period (Code Civ. Proc., § 583, subd. (b)), and extended the deadline for bringing those cases to trial. Thereafter, Judge Richard Bartalini, to whom the case was assigned for trial, dismissed the action, on motion of the defendants, for failure to bring it to trial within five years. The court stated, "[D]efendants were, in effect, asking Judge Bartalini to focus on the particular facts of the case and, in light of those facts, to rethink Judge McCullum's order and to see whether he agreed with it. No statutory authority exists for such a request, and Judge Bartalini erred in granting it. [Citations.] General order 3.30 could 'not be set aside simply because "the court concludes differently than it has upon its first decision." ' [Citations.]" (*Greene* v. *State Farm Fire & Casualty Co., supra,* 224 Cal.App.3d at p. 1589.)

In our case, Corydon intervened in the action between plaintiffs and Armstrong, seeking access to the sealed record for the limited purpose of preparing his own cases involving the Church. Judge Geernaert, on his own motion, vacated Judge Breckenridge's order sealing the record. The time had

long since expired for reconsideration of Judge Breckenridge's order (Code Civ. Proc., § 1008), or relief therefrom pursuant to Code of Civil Procedure section 473, and the parties had the right to rely on the sealing order. No showing was made other than that supporting Corydon's motion for access to the record.[4] We hold Judge Geernaert exceeded his authority in vacating Judge Breckenridge's order sealing the record.[5]

*The Record on Appeal Is Not Sealed*

There remains a question as to the effect of this appeal upon the sealing order. The brief filed by the plaintiffs apparently assumes continued effectiveness of the order on appeal.

■ In *Champion v. Superior Court* (1988) 201 Cal.App.3d 777 [247 Cal.Rptr. 624], the court referred to "an increasing trend by litigants to assume that when the parties stipulate below or convince the trial court of the need for confidentiality, no showing of need must be made in this court." (*Id.* at p. 785.) The *Champion* court determined to the contrary, stating "that a party seeking to lodge or file a document under seal bears a heavy burden of showing the appellate court that the interest of the party in confidentiality outweighs the public policy in favor of open court records. 'The law favors maximum public access to judicial proceedings and court records. [Citations.] Judicial records are historically and presumptively open to the public and there is an important right of access which should not be closed except for compelling countervailing reasons.' [Citation.]" (*Id.* at p. 788.)

Plaintiffs cite *Champion*, claiming, inter alia, that the appellate court, in granting the motion to seal in that case, stated it was "influenced by the

---

[4]Plaintiffs do not challenge Corydon's access to the record, stating in their brief: "Corydon's access must continue to be limited by the conditions imposed thus far by this court's Modified Temporary Stay Order . . . . He sought access only for use in private litigation against the Church; this court's order, which permits him to use the information he obtains only in said litigations and only after making a good faith effort to have it introduced under seal, is appropriately tailored to meet his asserted need without unnecessarily invading appellants' privacy." Pursuant to the stay order issued by Division Four, Corydon has had the desired access since December 22, 1988, and the issue is moot as to him. He now seeks in this court more than he sought by his motion in the trial court.

[5]Armstrong, who did not participate in the hearing on the motion below, has filed a brief claiming the record should be unsealed because the Church has failed to comply with the terms of its settlement agreement with him. His declarations to the latter effect are not properly before us on this appeal, as they were not considered by the trial court. We therefore consider neither the meaning of the portions of the settlement agreement to which he refers nor the question whether the Church has complied therewith.

We are also in receipt of an amicus curiae brief of Lawrence Wollersheim, who urges unsealing of the record based on reasons of public policy. Wollersheim's argument is directed primarily to the documentary exhibits lodged in the underlying case. Those documents have been returned to the Church in accordance with the terms of the settlement agreement.

parties' agreement to the procedure and by the lower court's sealing of its records." The quoted language appears at page 786 of the decision, and refers to the court's initial response to requests to seal received in connection with the petition, opposition, and amici curiae requests. Later, after receiving "rebuttal briefs, rebuttal declarations, reply to amici, declarations in reply to amici, and supplemental declarations," (*Champion v. Superior Court, supra,* 201 Cal.App.3d at p. 786) resulting in a file containing "some sealed documents, some public documents, and many documents not yet designated as sealed or public," (*ibid.*) most of which blended together discussions of confidential and public materials, as well as requests to seal all of the documents without any explanation of why any of the documents deserved such treatment (*ibid.*), the court stated, at page 787, "it is apparent that we acted precipitously in granting the earliest, unsupported, requests to seal documents lodged or filed in this matter." While the court did ultimately grant the application to seal the entire file, it did so because of the confusion and undue complication and delay that would be caused by return of the documents for segregation into public and confidential portions. (*Id.* at pp. 789-790.)

In our case, plaintiffs have not formally requested sealing of the record on appeal. They argue, in seeking reversal of Judge Geernaert's order vacating the sealing order made in the trial court, that their pursuit of an action brought primarily for the purpose of protecting their respective privacy interests in the documents converted by Armstrong should not cause disclosure of the very information they sought to protect, through references in the record to such information. The argument is not limited to any particular portion or portions of the voluminous record of the trial court proceedings. Should plaintiffs move to seal the record on appeal, we would require a much more particularized showing.

*The Defense of Justification Applies to the Causes of Action Alleged Against Armstrong; the Judgment Is Affirmed*

"One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other." (Rest.2d Torts, § 652A (1).) "The right of privacy is invaded by [¶] (a) unreasonable intrusion upon the seclusion of another, . . . or . . . (c) unreasonable publicity given to the other's private life . . . ." (Rest.2d Torts, § 652 A (2).) "The rules on conditional privileges to publish defamatory matter stated in §§ 594 to 598A, and on the special privileges stated in §§ 611 and 612, apply to the publication of any matter that is an invasion of privacy." (Rest.2d Torts, § 652G.) Under section 594 of the Restatement Second of Torts, "[a]n occasion makes a publication conditionally privileged if the circumstances induce a correct

or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest."

"Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge." (Rest.2d Agency, § 395.) However, "[a]n agent is privileged to protect interests of his own which are superior to those of the principal, even though he does so at the expense of the principal's interests or in disobedience to his orders." (Rest.2d Agency, § 418.)

■ With respect to plaintiffs' causes of action for conversion, "[o]ne is privileged to commit an act which would otherwise be a trespass to or a conversion of a chattel in the possession of another, for the purpose of defending himself or a third person against the other, under the same conditions which would afford a privilege to inflict a harmful or offensive contact upon the other for the same purpose." (Rest.2d Torts, § 261.) "For the purpose of defending his own person, an actor is privileged to make intentional invasions of another's interests or personality when the actor reasonably believes that such other person intends to cause a confinement or a harmful or offensive contact to the actor, of that such invasion of his interests is reasonably probable, and the actor reasonably believes that the apprehended harm can be safely prevented only by the infliction of such harm upon the other. (See § 63.) A similar privilege is afforded an actor for the protection of certain third persons. (See § 76.)" (Rest.2d Torts, § 261, com. b.)

We find no California case, and the parties cite none, holding that the above described privileges apply in this state.[6] ■ We believe the trial

---

[6]No purpose would be served by our engaging in an exhaustive discussion of each of the points asserted by plaintiffs.

For example, plaintiffs misconstrue the decision in *Dietemann* v. *Time, Inc.* (9th Cir. 1971) 449 F.2d 245. The *Dietemann* court stated: "Privilege concepts developed in defamation cases and to some extent in privacy actions in which publication is an essential component are not relevant in determining liability for intrusive conduct antedating publication." (*Id.* at pp. 249-250.) The question in that case was whether the defendant, whose employees gained entrance to plaintiff's home by subterfuge and there photographed him and recorded his conversation without his consent, was insulated from liability by the First Amendment because its employees did these acts for the purpose of gathering material for a magazine story which was thereafter published. The case has nothing to do with the justification

court appropriately adopted the Restatement approach respecting conditional privilege. (See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 278, p. 360; *Gilmore* v. *Superior Court* (1991) 230 Cal.App.3d 416, 421 [281 Cal.Rptr. 343].)

In its statement of decision the court found Armstrong delivered the documents in question to his attorney ". . . because he believed that his life, physical and mental well-being, as well as that of his wife, were threatened because the organization was aware of what he knew about the life of L. Ron Hubbard, the secret machinations and financial activities of the Church, and his dedication to the truth. He believed that the only way he could defend himself, physically as well as from harassing lawsuits, was to take from Omar Garrison those materials which would support and corroborate everything that he had been saying within the Church about L. Ron Hubbard and the Church, or refute the allegations made against him in the April 22 Suppressive Person Declare. He believed that the only way he could be sure that the documents would remain secure for his future use was to send them to his attorneys, and that to protect himself, he had to go public so as to minimize the risk that L. Ron Hubbard, the Church, or any of their agents would do him physical harm." The court's findings were substantially supported by the evidence adduced at trial.

*Admission of Documentary and Testimonial Evidence Over Appellants' Objections Did Not Result in a Miscarriage of Justice*

█ Armstrong's defense was predicated on his claim that he reasonably believed the Church intended to cause him harm, and that he could prevent the apprehended harm only by taking the documents, even though the taking resulted in harm to the Church.

---

asserted herein. *Pearson* v. *Dodd* (D.C. Cir. 1969) 410 F.2d 701 [133 App.D.C. 279], is similarly inapposite.

Discussing the privilege of an agent set forth in section 418 of the Restatement Second of Agency, plaintiffs point to the last sentence of comment b, which reads: "So, too, if the agent acquires things in violation of his duty of loyalty, he is subject to liability for a failure to use them for the benefit of the principal." This language has reference to the initial sentence of the comment: "If the conflict of interests is created through a breach of duty by the agent, the agent is subject to liability if he does not prefer his principal's interests." In the present case, the conflict was created by the plaintiffs, who threatened Armstrong with harm.

Referring to comment b to section 396 of the Restatement Second of Agency, which has to do with the use of customer lists in unfair competition, plaintiffs urge that even if Armstrong was privileged to verbally report to others information he gained in his capacity as an agent of the Church, he would not be privileged under any circumstances to retain or disseminate Church documents. They also urge, based on cases which are inapposite to that at bench, that the justification defense applies only in emergency situations requiring immediate action to avert danger, or where the agent believes that the principal's documents are the fruits or instrumentalities of crime or fraud. The court found, on substantial evidence, that Armstrong was under a reasonable apprehension of danger when he delivered the documents to his attorney. More was not required.

Plaintiffs complain of the trial court's admission of documentary and testimonial evidence concerning the history of Armstrong's relationship with the Church, and certain practices of the Church in relation to its members, as well as its former members and/or critics. The record is replete with statements of the court's recognition of the limited purpose for which the complained of statements were properly admitted, i.e, to prove Armstrong's state of mind when he converted the Church's documents. These statements are referenced in Armstrong's briefs, and acknowledged by plaintiffs.

Plaintiffs complain that certain testimony of defense witnesses was irrelevant, as there was no showing that Armstrong was aware of the facts to which the witnesses testified. The testimony in question was largely corroborative of Armstrong's testimony with respect to Church practices affecting his state of mind, and was relevant to the issue of the reasonableness of his belief that the Church intended to cause him harm.

Plaintiffs complain, finally, that the trial court's statement of decision shows the court improperly considered the evidence admitted for the limited purpose of establishing Armstrong's state of mind. We are satisfied the complained of comments reflect the court's findings on the elements of the justification defense asserted by Armstrong, and that neither the admission of the evidence nor the court's comments resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.)

## DECISION

The judgment is affirmed. The order vacating the order sealing the record in the trial court is reversed. Each party to bear its own costs on this appeal.

Klein, P. J., and Hinz, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 17, 1991.